**Edward Johnson**, OSB #965737
ejohnson@oregonlawcenter.org
**Stephen Walters**, OSB #801200
swalters@oregonlawcenter.org
**OREGON LAW CENTER**
522 SW Fifth Ave, Suite 812
Portland, OR 97204
Phone (503) 473-8310

**Rebecca Morgan**, OSB #143890
rebecca.morgan@lasoregon.org
**Diane D. Nguyen**, OSB #185427
diane.nguyen@lasoregon.org
**LEGAL AID SERVICES OF OREGON**
520 SW Sixth Ave, Suite 700
Portland, OR 97204
Phone (503) 224-4086

**J. Ashlee Albies**, OSB #051846
ashlee@albiesstark.com
**ALBIES, STARK & GUERRIERO, LLC**
1 SW Columbia St, Suite 1850
Portland, OR 97204
Phone (503) 308-4770

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **EMANUEL DISPLACED PERSONS ASSOCIATION 2**; **GLORIA CAMPBELL-CASH, ISAAC CAMPBELL, IZEAL CAMPBELL, MARILYN K. HASAN, ROSIE TAYLOR, ELIZABETH FOUTHER-BRANCH, BOBBY FOUTHER, KAREN SMITH, ALICIA BYRD, BRIAN MORRIS, JOANNE BOWLES-SPIRES, CLAUDE BOWLES, MARY BOWLES SHOALS, ROYAL HARRIS, RAHSAAN MUHAMMAD,** | Case No. <br><br> **COMPLAINT** <br><br> **42 USC § 1985** <br> **Conspiracy to Violate Civil Rights** <br> **Unjust Enrichment** <br> **Nuisance** <br><br> Jury Trial Demanded |

1 – COMPLAINT

**MIKE HEPBURN, BEVERLY HUNTER, JUANITA BIGGS, CONNIE MACK, TRAVANTE FRANKLIN, DONNA MARSHALL, BARBARA DUMAS, LAKEESHA DUMAS, JAMES SMITH SR., CLIFFORD TYRONE DUMAS, and VALDA MCCAULEY,**

          Plaintiffs,

v.

**CITY OF PORTLAND, PROSPER PORTLAND fka the PORTLAND DEVELOPMENT COMMISSION, and LEGACY EMANUEL HOSPITAL & HEALTH CENTER,**

          Defendants.

## COMPLAINT

This case is about the intentional destruction of a thriving Black neighborhood in Central Albina under the pretense of facilitating a hospital expansion that never happened. Plaintiffs are twenty-six Black survivors and descendants of families whose homes were destroyed by defendants, as well as an organization formed to help them seek justice. This horribly racist chapter from Portland's past has not closed, causing plaintiffs continuing harm in the form of an ongoing public nuisance. Further, the unjust enrichment of defendants, flowing directly from the destruction of plaintiffs' former neighborhood, continues to this day and will continue into the future unless abated. In addition, recently discovered information long concealed by defendants shows the contours of a conspiracy between defendants to deprive plaintiffs of their civil rights.

Starting in the late 1950s and into the early 1970s, the City of Portland (the City), Prosper Portland (formerly known as the Portland Development Commission or PDC), and Legacy

2 – COMPLAINT

Emanuel Hospital and Health Center (Emanuel) acted in concert to destroy a predominately Black community and displace hundreds of families from their homes and businesses in Central Albina. The displacement and destruction were done beneath the flag of urban renewal and in the false name of progress and of removal of "blight." Yet for decades, much of the demolished and cleared land has languished empty and unused, creating real blight. That vacant land serves as a constant reminder to the survivors and descendants of those displaced families of what they once had, what their family could have had for generations, and what was taken from them. For plaintiffs, the loss of their family homes has meant the deprivation of inheritance, inter-generational wealth, community, and opportunity. Recently discovered information, long concealed by defendants, shows that urban renewal and blight were pretexts for defendants' real motive: a racist desire to remove Black people from the economically valuable neighborhood of Central Albina. Over the decades and in recent years, the City, PDC, and Emanuel have profited from this stolen land. Far from removing "blight," defendants' concerted actions created a public nuisance that, to this day, has not been remedied and is causing plaintiffs continuing inter-generational harm.

As Emanuel purports to "give back" some of the vacant land "to the community" for development, there is no plan to compensate plaintiffs and other displaced families for what the City, PDC, and Emanuel have taken from them. Under claims of unjust enrichment, public nuisance, and conspiracy to violate civil rights pursuant to 42 USC § 1985, plaintiffs hereby seek tangible justice beyond symbolic apologies. They seek financial restitution for their losses.

## I. JURISDICTION AND VENUE

1.      Jurisdiction exists for plaintiffs' conspiracy claim pursuant to 28 USC § 1343 in that plaintiffs' claims arise under 42 USC § 1985. Supplemental jurisdiction exists for plaintiffs'

3 – COMPLAINT

additional claims under 28 USC §1367. Venue is proper in the District of Oregon pursuant to 28

USC § 1391(b)(2) because the City of Portland, Prosper Portland, and Emanuel are in this

district and the events giving rise to plaintiffs' claims occurred in this district.

## II. PARTIES

2.      Plaintiffs are individuals whose family homes were taken and demolished in a

conspiratorial effort to rid Central Albina of its predominantly Black inhabitants. For decades,

Black people resided in the Albina community for economic, social, spiritual, and civic growth.

Black culture was centralized and maintained within that tightly knit and geographically

restricted community. Black people invested in Albina when it was not popular or profitable to

do so. They worked there; raised their children; paid taxes; created and participated in political,

social, and religious organizations; purchased and maintained homes; built community;

safeguarded the area; and so much more. They were the stewards of the neighborhood, and

because of their investments, Albina has blossomed into the economic powerhouse that it is

today. Yet, the Black pioneers of Albina—more specifically, Central Albina—are not benefiting

from the fruit of their labor. They are not benefiting from the economic growth and prosperity

that they cultivated. The demolition of Central Albina extends beyond the splintering of homes.

Black residents were robbed of their investment and inheritance. They suffered economic

strangulation that continues to this day. Many of them went from a self-governing neighborhood

with ownership and control to becoming a renter class forced to look outside of themselves to

solve their problems. The displacement and demolition of Central Albina severely compromised

the community's ability to control their own destiny. It eradicated plaintiffs' political power, and

worst of all, it fractured families.

3.      As detailed below, the destruction of this neighborhood and the displacement of plaintiffs' families took place in two phases. Phase One (from the late 1950s until the late 1960s) involved Emanuel, acting with the then-unknown sanction of the City and PDC, intimidating people into leaving their homes, which were destroyed one at a time. Phase Two (from the late 1960s until 1973) involved the City and PDC coming out of the shadows and publicly engaging in the false narrative that Central Albina was "blighted" because of plaintiffs' and their families' presence and taking the remaining homes and businesses in the community via an unlawful use of urban renewal and eminent domain. It was not until earlier this year that plaintiffs learned that, as part of the conspiracy to deprive plaintiffs of their civil rights, the City had secretly agreed to compensate Emanuel for the full cost of the Phase One purchases and demolitions. In fact, Emanuel received back every dollar that they had spent in buying and demolishing the 100-plus homes taken during Phase One, in the form of tax credits from the City. The individual plaintiffs described below are grouped based on these two phases of destruction and displacement.

A.      **Organizational Plaintiff**

4.      The Emanuel Displaced Persons Association 2 (EDPA2) is an ad hoc community organization made up of survivors and descendants of those whose homes were taken and demolished in Central Albina and whose thriving and supportive community was fragmented by the never-fully-consummated Emanuel Hospital Urban Renewal Project. EDPA2's purpose and mission are to seek justice and restitution for survivors and descendants of families whose homes were taken and destroyed by defendants. EDPA2 has suffered and continues to suffer diversion of resources and frustration of mission from defendants' historic and ongoing actions and inactions.

B.       **Individual Plaintiffs**

i.       **Phase One:  Emanuel Destroys Homes with the Hidden
            Sanction of the City and PDC.**

*The Campbell Family – 523 N. Knott*

5.       Plaintiff Gloria Campbell-Cash is a resident of the State of Oregon. She was born
in 1945. Ms. Campbell-Cash is the daughter of Ivy and Lillian Campbell. After moving to
Portland to escape the brutal racism of Mississippi in 1946, the Campbells saved and purchased a
house at 523 N. Knott in 1951. Located one block south of Emanuel Hospital in a safe and clean
neighborhood with beautiful gardens, the house featured four bedrooms, a big backyard, and a
large kitchen. Ms. Campbell-Cash's parents purchased the house to start a foundation for the
family, to invest in homeownership, and to firmly root the family in Portland's Black
community. Her parents had a purchase contract with the seller and had paid a $750 down
payment and $65 or more including six-percent interest for approximately 12 years. In 1963,
under intimidation and threats from Emanuel, the Campbells were forced to sell their interest in
the property to a real estate agent for a mere $10, thereby relinquishing all of the home equity
that they had worked hard to build over the preceding 12 years. **"**The hospital didn't care if we
lived or died," states Ms. Campbell-Cash as she reflected on the Lutheran Charity Board and
Emanuel's seizure of their home. Even though this was years before the City's involvement
became public, Emanuel representatives had told the Campbells that the City was going to take
the property if they did not leave immediately. After the family was forced out, Emanuel bought
their property for $4,332.06 in 1965 from a subsequent owner, with the Campbells receiving
none of that money. Emanuel's seizure and demolition of the Campbells' home ruined their
financial ability to send their children to college, forced them to start over in their advanced age

6 – COMPLAINT

and declining health, and deprived the Campbell children of inheritance to which they would

have been entitled. Emanuel, in contrast, was later financially credited and effectively

reimbursed by the City and PDC for the cost of purchasing and destroying the Campbell home

and the roughly one hundred other homes obtained and destroyed during the 1960s. Ms.



*Figure 1: The Campbell siblings in front of their home at 523 N. Knott (1955).*

Campbell-Cash recalls that Emanuel started taking or purchasing homes in the neighborhood and

destroying them in the late 1950s. Before the Campbells' house was taken and destroyed, houses

behind theirs had been demolished and replaced with a tennis court for Emanuel staff to recreate.



*Figure 2: The Campbells' house at 523 N. Knott, with Emanuel's staff tennis court visible in the background (1965).*

Ms. Campbell-Cash recalls that there was no "blight" until Emanuel started destroying homes in the neighborhood. Had it not been taken and destroyed, the estimated value of the Campbell family's house was $580,000 as of April 2021. Ms. Campbell-Cash continues to be harmed by defendants' actions and inactions.

6.      Plaintiff Isaac Campbell is Ms. Campbell-Cash's brother. Mr. Campbell continues to be harmed by defendants' actions and inactions.

7.      Plaintiff Izeal Campbell is Ms. Campbell-Cash's brother. Mr. Campbell continues to be harmed by defendants' actions and inactions.

*The Davis Family – 319 and 320 N. Monroe*

8.      Plaintiff Marilyn Hasan is a resident of the State of Oregon. Ms. Hasan's parents,

Hanson and Willie C. Davis, owned the three-bedroom, one-bathroom house with an unfinished

basement located at 320 N. Monroe. Her great-grandmother, Dora Williams, owned the five-

bedroom, one-bathroom, two-story house across the street at 319 N. Monroe. Her parents had

purchased their Central Albina home after relocating there following the Vanport flood of 1948.

In 1965, when she was about ten years old, Ms. Hasan came home from school and learned that

Emanuel representatives had told her parents at a meeting that the family had 60 days to "get

out" of their home or that it would be taken from them by Emanuel, the Lutheran Charity Board,

and the City. Having dealt with the violent racism of Louisiana, Arkansas, and Oregon, Ms.

Hasan's parents decided to move from the Albina neighborhood to the Irvington neighborhood.

The move forced their family of six out of the familiar home and community where they had had

everything that they needed. Instead, the family had to relocate to an unwelcoming white

neighborhood. White neighbors would not allow their children to play with Ms. Hasan, who was

also subjected to overt racism for the first time at her new, predominantly white school. To this

day, Ms. Hasan cannot speak of the traumatic experience without crying. As a child, she felt like

she had lost everything. She remembers how the tragic ordeal broke her father, who was her hero

and with whom Ms. Hasan was extremely close. Emanuel took and demolished both the Davis'

home and great-grandmother Williams' home in the mid-1960s. Although Ms. Hasan recalls that

her old home was near Dawson Park, no trace of the houses or the street on which they resided

remains. Ms. Hasan continues to be harmed by defendants' actions and inactions.

9.      Plaintiff Rosie Taylor is Ms. Hasan's sister. She was born in 1949. Ms. Taylor

remembers Emanuel representatives meeting with her parents and other residents in the

neighborhood and telling them that Emanuel wanted the residents to move to accommodate plans to enlarge the hospital. Although her parents did not discuss "grownup issues" with the children, Ms. Taylor knows that her parents were not fairly compensated for their home's worth. Nevertheless, Emanuel's pressure left the family with little option but to move out. They relocated to NE 14th and Fremont, a predominantly white neighborhood in what is now Irvington. Ms. Taylor estimates that 95 percent of the residents in their new neighborhood were white. The move occurred while Ms. Taylor was a sophomore at Jefferson High School. Before moving, Ms. Taylor could safely walk to and from school every day together with her friends. In her new neighborhood, Ms. Taylor did not have any friends. After the move, and despite having to wake up earlier to take two busses to school, Ms. Taylor insisted on continuing to attend Jefferson. Defendants' displacement activities in Central Albina had forced many families and friends to separate and had severed the community closeness that Ms. Taylor had grown up with; commuting to Jefferson was her way of protecting the friendships and connections that remained. Ms. Taylor used to walk to the A.M.E. Zion Church on Williams and Hancock with friends; that was no longer possible after the move. Her family used to live within walking distance of life's necessities and conveniences, such as the grocery story, the dentist, and their beautician next door; the move placed them in a neighborhood without any of that. Ms. Taylor recalls that her parents' house and her great-grandmother's house on N. Monroe stood empty for years before they were finally demolished and redeveloped with hospital buildings. Ms. Taylor continues to be harmed by defendants' actions and inactions.

***The McCauley Family – 106 N. Graham***

10.     Plaintiff Valda McCauley is the granddaughter of Amanda Warren, who owned the home located at 106 N. Graham. Due to the Emanuel expansion project and other urban

renewal projects targeting North Portland's Black neighborhoods, Ms. McCauley and her family were forced to move around a number of times. As a child, Ms. McCauley and her mother and siblings lived with her grandmother for about four years. The youngest three McCauley children were bussed to an all-white school in Portland's southwest suburbs, and her grandmother worked as a housecleaner for rich white people. Ms. McCauley's mother, Amanda Elizabeth McCauley, also worked for Emanuel, injuring herself on the job. In the mid-1960s, Emanuel staff pressured her grandmother to leave under the threat that the City was going to take the home if she refused to do so voluntarily. Emanuel purchased Ms. McCauley's grandmother's home in December of 1965 for $7,485.20 and spent an additional $612 in demolition. Ms. McCauley continues to be harmed by defendants' actions and inactions.

***The Fouther/Williams Family – 3222 N. Gantenbein***

11.     Plaintiff Elizabeth Fouther-Branch is a resident of the State of Oregon. She was born in 1952. Her family has lived in Portland since the 1920s. Ms. Fouther-Branch's great-aunt was Della Mae Williams. Della Mae and her husband Sterling Williams bought the house located at 3222 N. Gantenbein in 1934. Around 1949, the Williams deeded the home to their daughter Gertrude and son-in-law Arvoll Rae. After Mr. Rae went into real estate and bought another house, the Williams deeded their home to the next generation, intending to maintain control and ownership within the family with each subsequent generation. The Williams were union leaders, business owners, entrepreneurs, and founding members of the local Urban League. Their family home was a place to host boarders, raise children, and engage in daily routines that held the family together. Growing up, Ms. Fouther-Branch and her brother Bobby spent time at Great-Aunt Della Mae's house daily, visiting on most weekends and throughout the summer. Ms. Fouther-Branch recalls, "The natural tradition of taking care of one another traveled with the

11 – COMPLAINT

family." The home was at the core of the Williams' plans to establish economic and housing



*Figure 3: The Williams' house at 3222 N. Gantenbein (1960).*

security for their descendants through homeownership in Central Albina. The Williams had no

intention of relinquishing ownership of their family home to the City, Emanuel, or PDC. But in

late 1962 or 1963, Emanuel representatives told Mrs. Williams that she would have to leave her

home because all homes in the area were going to be torn down for the hospital's expansion. If

the family didn't leave, Emanuel representatives threatened, the City would take their home. The

Emanuel expansion crippled the Williams' plans for their family. The Williams and Rae families

left the area and, despite receiving zero compensation from Emanuel for their forced

displacement, persevered and purchased a home in the historic Irvington neighborhood. In 1968,

five years after they had been forced to leave, their house still sat vacant. In fact, it seems that the family home was still there more than a decade after Ms. Fouther-Branch's great-aunt's family was forced out. Now, a parking lot occupies the space where the family home once stood. Had it not been taken and destroyed, the estimated value of the Williams family's house was $572,994.45 as of April 2021. Ms. Fouther-Branch continues to be harmed by defendants' actions and inactions.

12.    Bobby Fouther is a resident of the State of Oregon. He is Ms. Fouther-Branch's brother. He was born in 1950. He remembers growing up in Central Albina before it was destroyed by defendants. He recalls the neighborhood being a safe, clean, and supportive place to grow up. The only "blight" that Mr. Fouther recalls in Central Albina occurred after Emanuel started demolishing houses. Mr. Fouther continues to be harmed by defendants' actions and inactions.



*Figure 4: Left: Elizabeth Fouther-Branch and Bobby Fouther in front of their great-aunt's house in Easter attire (1956); right: Elizabeth and Bobby in the front of the parking lot near where the house used to stand (2020).*

13 – COMPLAINT

ii.     **Phase Two:  The City and PDC Step Out of the Shadows and Overtly Help Emanuel Destroy the Rest of the Neighborhood Via Eminent Domain.**

*The Smith Family – 222 N. Cook*

13.     Plaintiff Karen Smith is a resident of the State of Oregon. Ms. Smith's parents, Aaron Joe and Sarah Lou Smith, owned the house at 222 N. Cook. The Smiths were first-time homebuyers in this racially segregated city. Homeownership was a huge accomplishment for them and a gift that they wanted to pass on to their youngest daughter, Karen. Ms. Smith grew up in a safe, loving, and protective community. Without effort, she can recall by name the many neighbors who cared for and nurtured her. Ms. Smith also fondly recalls the Wonder Bread Bakery down the street, where neighborhood children would line up at the window for a slice of warm bread. That idyllic childhood was abruptly shattered by defendants, who told the Smiths one day that their family would have to move to make way for a "veteran's hospital." Ms. Smith's family got together with other neighbors in the area (including the Bowles and Burns families) to discuss the matter, because they knew that defendants' efforts to take away their homes were wrongful and unfair. But the families were allowed no input in the matter: "It wasn't our choice," Ms. Smith recounts. Despite great skepticism towards the relocation process, the Smiths eventually and reluctantly moved due to the intimidation that they were experiencing, including the frequent visits of real estate agents to their home. They were forcefully relocated to a predominantly white neighborhood in the early 1970s, and Ms. Smith's childhood home was demolished soon after. However, Ms. Smith recalls that the leveled land where her home had once stood remained vacant for at least 15 or more years before any construction finally commenced. Only after that did her family learn that, rather than an unaffiliated veteran's hospital as they had initially been told, it was Emanuel that was building onsite, until federal

14 – COMPLAINT

funding for its expansion project dried up. Ms. Smith states, "Our homes were demolished for the gain of someone else's profits." Had it not been taken and destroyed, the estimated value of the Smith family's house was $445,943.77 as of April 2021. Ms. Smith continues to be harmed by defendants' actions and inactions.

***The Morris Family – 253 N. Fargo***

14.    Plaintiff Alicia Byrd is a resident of the State of Oregon. Ms. Byrd's grandmother Esther Morris owned the house located at 253 N. Fargo, where Ms. Byrd's mother Ester Lewis grew up. Born as the only girl in a family of boys to a Black man named King Black and a Chickasaw mother, Ms. Morris was a tough woman who had survived the Vanport flood and overcame housing discrimination to settle in the Black neighborhood of Central Albina. Widowed and raising eight children alone, Ms. Morris worked 18 hours a day, including at the Kaiser shipyard, cleaning hotels, and at taverns. Her determination and uncanny ability to move and adapt allowed the family to own property despite the racial upheaval of the time. Ms. Morris purchased her first home "on contract" from a German couple. Together with her husband Charles Douglass, Ms. Morris also opened Doug's Tavern in 1964 at 22 NE Russell in Central Albina, because she "wanted a place where people could laugh and have a good time." When rumors of the demolitions began to swirl, Ms. Morris moved away before her house was taken, leaving a daughter and the daughter's family to rent the house. Emanuel, the City, and PDC demolished Ms. Morris' home and business to accommodate the hospital expansion that never occurred, and Ms. Morris never received any compensation. Had it not been taken and destroyed, the estimated value of the Morris family's house was $333,354.31 as of April 2021. Ms. Byrd continues to be harmed by defendants' actions and inactions.

15.     Plaintiff Brian Morris is Ms. Lewis' nephew and Ms. Morris' grandson. He was born in 1966 and lived at 253 N. Fargo when he was a little boy. He recalls moving with his mother from his grandmother's home into a rental property on N. Going that was in poor condition. His mother had to join the military because of this displacement, and he eventually moved in with relatives in California. Mr. Morris continues to be harmed by defendants' actions and inactions.

**The Bowles Family – 223 N. Cook**

16.     Plaintiff Joanne Bowles-Spires is a resident of the State of Oregon. She was born in 1956. Her grandparents Evie and Pearlie Mae Bowles lived in pre-Civil Rights Alabama before moving to Portland for a better life. Their desire to settle down was interrupted several times following the Vanport flood that had forced them to relocate to Guild's Lake. When the



*Figure 5: The Bowles' house at 223 N. Cook (1969).*

Bowles purchased their home at 223 N. Cook 1951, in the predominantly Black neighborhood of Central Albina, they finally felt settled and at home. The Bowles used their home to assist others relocating from the Deep South in search of a brighter future. They wanted to own their home so that their children would have somewhere to go and something to look forward to when they were older. The demolition of their home excluded the Bowles family from the wealth that is now generated in gentrified Central Albina. A parking lot occupies what was once the Bowles' family home. Had it not been taken and destroyed, the estimated value of the Bowles family's house was $446,973.91 as of April 2021. Ms. Bowles-Spires continues to be harmed by defendants' actions and inactions.

17.     Plaintiff Claude Bowles is Ms. Bowles-Spires' brother. He was born in 1960. He recalls his grandfather Evie Bowles often instructing him to "hold on to this house," because his sisters might marry a man who did not appreciate them, and they may need somewhere to go. But the family ended up moving to a different neighborhood. The N. Cook home that the Bowles were forced to leave had been 3,000 square feet, two stories high, and directly around the corner from a tavern owned by Mr. Bowles' father; the house to which the family relocated was approximately 900 square feet, had an unfinished, leaking basement, and was in worse condition. His grandparents got pushed out of Central Albina and lost their opportunity to build wealth. No one in the Bowles family can afford to move back into that neighborhood now. Mr. Bowles remembers the Central Albina community being very safe and supportive. He says that everyone knew everyone else and that "you couldn't get away with anything." Mr. Bowles reports, "The final slap in the face is all of this eminent domain you did to the people, you make promises and you never deliver…profiting from this again." Mr. Bowles continues to be harmed by defendants' actions and inactions.

18.     Plaintiff Mary Bowles Shoals is Ms. Bowles-Spires and Mr. Bowles' sister. She continues to be harmed by defendants' actions and inactions.

***The Marshall Family – 2740 N. Vancouver and 247 N. Fargo***

19.     Plaintiff Donna Marshall's parents, Louie Edison Jr. and Beatrice Green Marshall, owned houses at 2740 N. Vancouver and around the corner at 247 N. Fargo, where they ran a family carpentry business called L&J Marshall Brothers. When defendants targeted the Marshalls' homes for seizure, the Marshall family refused to cooperate with PDC or Emanuel representatives and did not move willingly. The battle to keep their home was long and drawn out. Of the ordeal, Ms. Marshall recalls, "We did not want to move, but we had no choice. PDC was forcing us out, and there were no resources left. Pharaoh's army was behind us, and the Red Sea was in front of us." Ultimately, the Marshall's home was acquired by court judgment. They were one of the last families to leave the Emanuel expansion project area. The Marshalls relocated to 1026 NE 107th Place, but not without further racist obstacles. The new house, located in a "white neighborhood," had been taken off the market after the sellers found out that the Marshalls were Black. Then almost every resident in the neighborhood signed a petition to try to keep the Marshalls out. After the Marshalls won a discrimination lawsuit and were able to move in, some white neighbors moved out in protest. Isolated in an all-white neighborhood where they were not wanted, the Marshalls suffered economic and emotional damages. Had it not been taken and destroyed, the estimated value of the N. Vancouver house, a duplex, was $481,247.46 as of April 2021. Had it not been taken and destroyed, the estimated value of the N. Fargo house was $333,354.31 as of April 2021. Ms. Marshall continues to be harmed by defendants' actions and inactions.

*The Skipper Family – 3103 N. Vancouver*

20.     Plaintiff Rahsaan Muhammad is a resident of the State of Oregon. Mr.

Muhammad's great-aunt and great-uncle, Alberdia and General Skipper, owned the home at

3103 N. Vancouver. Although the Skippers had no biological children of their own, multiple

generations of younger family members, including the eldest child of Mr. Muhammad's

grandmother, had resided at their home before Emanuel acquired and demolished it. Mr. and

Mrs. Skipper had purchased their home through determination and hard work at the shipyard and

in hospital housekeeping, respectively. But Emanuel's below-market acquisition of the Skippers'

home and consequent displacement of the family destabilized their economic, social, and civic

lives. The Skippers—by then two retirees raising a four-year-old niece as their child—were able

to purchase a new house only after supplementing the money from the forced, undervalued sale

of their N. Vancouver home with their personal savings. Mr. Muhammad continues to be harmed

by defendants' actions and inactions.

21.     Plaintiff Royal Harris is a resident of the State of Oregon. He is Rahsaan

Muhammad's cousin and also the Skippers' great-nephew. Mr. Harris was born in 1969 and had

lived with the Skippers at 3103 N. Vancouver from the age of 10 months until defendants'

unlawful actions forced the family to move out in 1973. A parking structure for Emanuel now

sits where their home had once stood. Had it not been taken and destroyed, the estimated value

of the Skipper family's house was $293,758.26 as of April 2021. Mr. Harris continues to be

harmed by defendants' actions and inactions.

*The Mack Family – 2732 N. Kerby*

22.     Plaintiff Connie Mack is a resident of the State of Oregon. She is the only child of

Ferrell A. Mack and Vashti C. Mack, who owned the home at 2732 N. Kerby. The Mack family

19 – COMPLAINT

had owned the home since 1948 when they were displaced by the Vanport flood and owned it "free and clear" when defendants took their home by force. While living in Central Albina, Ms. Mack felt loved and accepted by her parents and the Black community. She often played under the kitchen table while her mother cooked and talked. She remembers when her parents began to talk of the threatened, pending demolitions, and the attendant anxiety, fear, and disruption. Like other families, the Mack family's house was the glue that held everyone together. The Macks wanted to leave a legacy through homeownership. Their plan was to keep the family home and utilize Mr. Mack's G.I. loan to purchase a second house that would start the family on the road towards economic advancement and housing security. That did not happen. The demolition of their family home forced Mr. Mack to use his G.I. loan to help pay for a house in a white neighborhood thirteen miles away. Ms. Mack never again experienced the acceptance that she had in Central Albina. Negative childhood experiences resulting from the demolition of her family home affect her today. Records from the early 1970s indicate that the Macks had made many improvements to their home and maintained it in excellent condition. But a parking lot now sits where the home once stood. Had it not been taken and destroyed, the estimated value of the Mack family's house was $554,627.08 as of April 2021. Ms. Mack continues to be harmed by defendants' actions and inactions.

23.     Plaintiff Travante Franklin is Ms. Mack's child and the grandchild of Ferrell and Vashti Mack. Travante Franklin continues to be harmed by defendants' actions and inactions.

***The Garnett Family – 529 N. Monroe***

24.     Plaintiff Beverly Hunter's parents, Albert L. and Annie Garnett, owned the home at 529 N. Monroe. The Garnetts had moved to Portland in 1949. Mr. Garnett worked for the railroad while Mrs. Garnett was heavily involved in her church and community. Their settlement

and subsequent purchase of a family home in Central Albina were noteworthy accomplishments given the racially segregated society. Their home was the place to which every family member had gravitated and upon which each could rely for support and shelter. Two of Ms. Hunter's sisters-in-law had stayed there shortly after having their babies, knowing that Mrs. Garnett would help them. Then when one of Ms. Hunter's brothers and his family moved from Washington, they came to stay at the family home, knowing that it would be open to them. Ms. Hunter warmly recalls how her mother enjoyed bringing the family together for every holiday or whenever she felt that their family had been apart for too long. All of the Garnetts' children and their families would come home for Thanksgiving and Christmas at the family home; no one had ever missed those holiday dinners. The home "kept the family together" and provided a foundation for future successes. Ms. Hunter always thought that there would be a family home. But in 1971, defendants forced the Garnetts from their family home and then demolished it, shattering the symbol of success that Ms. Hunter's parents had laboriously built and scattering the members of a once tightly bonded family. Ms. Hunter never thought something like that would happen, and to date, things have never been the same for the family. Had it not been taken and destroyed, the estimated value of the Garnett family's house was $593,154.95 as of April 2021. Ms. Hunter continues to be harmed by defendants' actions and inactions.

**The Burns Family – 3233 N. Vancouver**

25.     Plaintiff Juanita Biggs is the granddaughter of Ecker and Mabel Burns, who owned the house located at 3233 N. Vancouver. To Mrs. Biggs, her grandparents' house was a "landmark, and going to Big Mama's house was very loving and precious." Mrs. Burns prepared and shared many meals with family members of the Central Albina community. For Mrs. Burns, homeownership involved sharing family traditions, establishing roots, and providing a place for

21 – COMPLAINT

generations to carry on their Creole traditions. The safety and security that Mrs. Biggs felt

growing up in a nurturing Black neighborhood is incomparable. When the demolitions happened,

she felt the deep disconnection of family and the loss of a lifestyle that she had known. The way

that her grandparents had been treated was "inhumane, disrespectful, lower-class treatment,"

states Mrs. Biggs. The church networks, friend connection, and neighborhood were gone. The

Burns had moved to Vanport after surviving a 1927 flood and a sawmill fire in Louisiana.

Defendants' taking and demolition of the Burns' home forced Mrs. Burns to start all over, again.

Mr. Burns died shortly before Mrs. Burns was forced to move, and Mrs. Burns' advanced age

made it more difficult for her to leave her home and relocate to an unknown district without her

spouse. The family's inheritance and the benefit of success that the community had worked so

hard to build was taken from them when Mrs. Burns was forced to move from the Central Albina

home to a house that did not meet standard living conditions—with issues such as roof leakages,

broken and leaking basement wall foundations, mold, and a corroded heating system—in a

rodent-infested neighborhood. Had it not been taken and destroyed, the estimated value of the

Burns family's house was $404,616.31 as of April 2021. Mrs. Biggs continues to be harmed by

defendants' actions and inactions.

***The Hepburn Family – 410-412 N. Knott***

26.    Plaintiff Mike Hepburn's grandparents, Donald and Elizabeth Hepburn, owned a

duplex property located at 410-412 N. Knott. The home had been owned by the Hepburn family,

starting with great-grandfather David Hepburn, since the early 1900s. After decades of owning

the home, the family was kicked out by defendants' abuse of the powers of urban renewal and



*Figure 6: The Hepburns' house at 410-412 N. Knott (1969).*

eminent domain, and they received zero compensation. Like many of the families in the

neighborhood, Mr. Hepburn's grandmother Elizabeth did not want to leave her home and her

community. She resisted to the point that PDC labeled her "not cooperative" and "difficult." The

PDC also described Mrs. Hepburn as "misinformed" because she was a member of the inaugural

Emanuel Displaced Persons Association (EDPA). Mrs. Hepburn was a widow who had worked

for St. Vincent Hospital and made a good salary. When her husband died in 1970, she was left to

make difficult decisions alone about raising her children, securing their future, and where they

would relocate. Even though the duplex was destroyed ostensibly to expand Emanuel, nothing

was ever built there. The lots remain vacant to this day, and Emanuel uses them to store

dumpsters and shipment containers. Mr. Hepburn's parents recall playing in a weeping willow

tree in the yard of the family home. Today, only the willow tree stands on this still-vacant

property. Mr. Hepburn lives in Portland as a renter and has never owned a home of his own. Had

23 – COMPLAINT

it not been taken and destroyed, the estimated value of the Hepburn family's house was $567,092.42 as of April 2021. Mr. Hepburn continues to be harmed by defendants' actions and inactions.



*Figure 7: The vacant lot where the Hepburns' house once sat (2022).*

### The Denson Family – 3316 N. Gantenbein

27.     Plaintiff Barbara Dumas is the daughter of Elmetric Lucille Jones and the granddaughter of Jewel Denson, who owned the home at 3316 N. Gantenbein. The family also operated a rooming house known as the Denson Rooming House. Despite Ms. Denson's wish and efforts to secure a stable future for her family, both the Denson family home and business were tragically lost to and destroyed by defendants, leading Jewel Denson to eventually relocate to Texas. Ms. Dumas continues to be harmed by defendants' actions and inactions.

24 – COMPLAINT

28.     Plaintiff LaKeesha Dumas is Barbara Dumas' daughter. LaKeesha is the great-granddaughter of Jewel Denson. She is just learning her family history and the pivotal role that her great-grandmother played in supporting Black families newly arrived in Portland. The recent revelations of her family history highlight the damage caused by defendants' destruction and erasure of Central Albina. LaKeesha's great-grandmother and grandmother owned homes and lost homes in Central Albina. The residual trauma fostered silence in her family. Talking about it was too painful. Nor was there any longer a place for the family to congregate and pass down family history. As a result, LaKeesha was deprived of the knowledge of her family's success and cultural heritage, and the Denson legacy of operating a rooming house to help in the resettlement of other Black families. As she puts it, "I didn't have a clear picture of the past and of my purpose." The City and Emanuel "took a piece of my heritage and legacy…I'm just finding all of this out." LaKeesha continues to be harmed by defendants' actions and inactions.

29.     Plaintiff James Smith Sr. is Barbara Dumas' son and LaKeesha Dumas' brother. Mr. Smith continues to be harmed by defendants' actions and inactions.

30.     Plaintiff Clifford Tyrone Dumas is Barbara Dumas' son. Mr. Dumas continues to be harmed by defendants' actions and inactions.

**C.     Defendants**

31.     Defendant Legacy Emanuel Hospital & Health Center (formerly Emanuel Hospital) is a nonprofit corporation located in what was once called Central Albina and is now known as the Eliot neighborhood in Portland, Oregon. The acts of Emanuel hereby complained of were intentionally committed and are ongoing.

32.     Defendant City of Portland is a municipality incorporated in the State of Oregon. As a local governmental entity, the City of Portland is a juridical entity under 42 U.S.C. § 1985.

25 – COMPLAINT

The acts of defendant City of Portland complained of were undertaken in the execution of customs, policies, and practices implemented or consented to by authorized policymakers of the City of Portland. The acts of the City of Portland hereby complained of were intentionally committed and are ongoing.

33.     Defendant Prosper Portland (formerly Portland Development Commission (PDC)) is the economic and urban development agency for the City of Portland. As a local governmental entity, Prosper Portland is a juridical entity under 42 U.S.C. § 1985. The acts of defendant Prosper Portland complained of were undertaken in the execution of customs, policies, and practices implemented or consented to by authorized policymakers of Prosper Portland/PDC. The acts of Prosper Portland hereby complained of were intentionally committed and are ongoing.

### III. FACTUAL ALLEGATIONS

**A.      Beginning of a Black Community in Albina**

34.     The Albina District in the north/northeast quadrant of Portland is synonymous with the city's Black community. Central Albina—commonly defined as the area bounded by Fremont Street, Interstate Avenue, Broadway Avenue, and Martin Luther King Jr. Boulevard (formerly Union Avenue)—is historically recognized as the heart of Black Portland. The concentration of Portland's Black population in Albina began in the early 20th century, as racist real-estate and land-use practices and policies geographically confined Black housing options to that area.

35.     Portland's real-estate industry contributed to the City's racial housing segregation. In 1919, the Portland Realty Board adopted a rule declaring it an ethical violation for its members to sell property in white neighborhoods to "Negro or Chinese people," insisting that

such sales would devalue neighboring (white) properties. Even though that official position was abandoned in 1952, in practice, many brokers continued refusing to sell houses in white neighborhoods to prospective Black buyers, for fear of losing future white business. As a result, for a significant part of the 20th century, Albina was largely the only area in Portland open to Black residents.

36.    The use of racially restrictive covenants—legal clauses written into deeds to restrict who could own and live on a property, based on their race—also perpetuated racial housing segregation. Developers commonly used such covenants when creating new developments, and they were akin to a form of privatized zoning before Portland's 1924 adoption of its first municipal zoning codes. Exclusionary zoning—the act of separating land for residential, industrial, or commercial uses, for reasons such as safety, public health benefits, aesthetics, and protection of property values—was another tool of racist City planning. Albina was an area of mixed residential, commercial, and industrial use, because local government agencies engaged in planning practices that preserved the exclusivity of some predominantly white single-family neighborhoods, while concentrating the City's growth and density in areas occupied by racially minoritized communities.

37.    Furthermore, predatory lenders engaged in "redlining," the practice of appraising Black neighborhoods at depreciated values to justify systematic denial of mortgage capital and restriction of federal and private lending to residents of those areas, thereby reinforcing racial segregation. A 1969 housing survey concluded that Black people "get bad terms in purchasing. They usually buy on contract paying 10% interest. It is difficult for them to get conventional financing. Selling prices are frequently inflated to Black buyers." Black homeowners with equity who wanted to move out of a redlined area faced discrimination in their attempts to buy in other

27 – COMPLAINT

neighborhoods or the suburbs. The abovementioned housing practices and policies enforced racial segregation in Portland, perpetrated economic inequality in Black neighborhoods, funneled Black Portlanders into Albina, and were early shapers of the City's urban form.

**B.    A Growing Black Community in Albina – World War II and Vanport**

38.    The concentration of Portland's Black community in Albina intensified during and following World War II. Between 1940–1950, the wartime economic boom and demand for labor drew tens of thousands of people to Oregon's shipyards and railroads, and Black migration to the state reached 6.9 percent. (Pre-1940, the net Black migration to Oregon had never been greater than one percent.) In Portland, the Black population temporarily grew an estimated tenfold—to approximately 20,000–25,000 people.

39.    The mass influx of wartime workers overwhelmed Portland's already burdened housing market, which largely excluded Black migrants. White residents and public officials feared that the arrival of more Black migrants would depreciate property values. Former City commissioner J.E. Bennett suggested that the City actively discourage the recruitment of Black workers. Mayor Earl Riley publicly complained that Portland could absorb only a minimum number of Black people without upsetting its "regular way of life."

40.    In 1942, impatient with the City's lagging response to the urgent need for housing for wartime workers, major shipyard owner Henry Kaiser obtained funding directly from the federal government to construct the largest wartime public housing project in the United States. Vanport quickly became the second largest city in Oregon and housed a Black population of almost 15,000, representing about 40 percent of Vanport's total population.

41.    In 1948, a massive flood completely demolished Vanport, rendering most of its Black residents homeless. Vanport's displaced residents were left with no other housing option

28 – COMPLAINT

than to move into the Albina District. The more that Black people moved into Albina from temporary wartime housing, the more that Albina's white residents moved out to newly developed suburbs—a trend labeled "white flight." Consequently, Albina experienced a significant racial turnover and, by midcentury, nearly half of Portland's Black population resided in Albina.

C.   **Albina – Portland's Vibrant Black Community**

42.   Despite the economic challenges imposed by racist City policies, Albina boasted a vibrant and resourceful working-class Black community. In its 1957 progress report, the City Club observed with apparent surprise that Central Albina offered a large number of programs, despite limited funding, including the Knott Street Community Center, which hosted a playschool, various kinds of athletics for youths and adults, teenage dances, dramatic activities, and arts and crafts for all ages, and which received over 6,000 visits a week; the new Eliot School, the Friendship House, and the North Branch YMCA, all of which offered adult education classes; and the Catholic-sponsored Blessed Martin Day Nursery, which provided much-needed sliding-scale childcare to working mothers and encouraged the enrollment of children of all religions and races. Also located in Central Albina were the Oregon Federation of Colored Women, the Bethel African Methodist Episcopal Church, and Vann's Walnut Park Chapel (the first Black-owned funeral home). Many of Albina's recreational and business offerings centered along Central Albina's Williams Avenue, the commercial hub of the entire district and Black Portland's own "Main Street." Central Albina was a vibrant and safe refuge for Black Portlanders and supported over a hundred local businesses, a thriving jazz scene, and strong community ties.

29 – COMPLAINT

### D. Beginning of Urban Renewal's Encroachment on Albina

43.     While Albina was transforming into the vibrant center of Portland's Black community in the mid-20th century, urban renewal reached Portland. Originating with the Housing Act of 1949, modern urban renewal programs provided federal loans and grants to local authorities to engage private enterprises to redevelop "slums" and "blighted" urban centers with modern transportation infrastructure, commercial buildings, and public service facilities. Across the United States, urban renewal projects targeted aging, close-in neighborhoods for redevelopment and disproportionately impacted Black communities and other communities of color concentrated in those areas following white abandonment to the suburbs. That was no different in Portland, where urban renewal encroached upon and decimated Albina beginning in the 1950s and continuing into the '60s and '70s—the devastating effects of which remain visible and continue to this day.

44.     Given their desire to protect Portland's white suburban enclaves from rising population density, nonresidential activities, high-intensity commercial, industrial, and institutional uses, and traffic from interstate highway systems, City officials and planners targeted the Black-inhabited Albina (with its attractively convenient proximity to downtown) for disruptive and displacing demolition and development. Consequently, land values in the Albina area soared in the mid-20th century. In the 1950s and '60s, Defendant City carried out multiple urban renewal projects that destroyed Black homes, businesses, and communities, and displaced Black residents in the Albina area. Notable among those projects were the Oregon Highway 99 construction along Interstate Avenue that required the demolition of 80 reported homes in Lower Albina and that cut the neighborhood off from the Willamette riverfront, and the Memorial Coliseum construction that destroyed commercial establishments and an estimated 476 more

30 – COMPLAINT

homes in Lower Albina and displaced hundreds of residents. Defendant Prosper Portland

(formerly PDC)—the local public agency created in 1958 and authorized to perform functions

related to urban renewal, including redevelopment, property acquisition, and land clearance—

oversaw the projects, both of which served to heighten the Black population density in Central

Albina by limiting other housing options for Black Portlanders.

        **E.**        **Emanuel Hospital Urban Renewal Project in Central Albina**

                **i.**        **Emanuel's economic influence fueled early "renewal" studies.**

    45.    Emanuel has been located in Central Albina since 1915. The hospital has long

been the largest nonindustrial building complex in the entire Albina area, a fact of which City

officials and planners were and are very mindful. In the late 1950s, discussions began between

City representatives, private urban renewal consultants, and Emanuel about the creation of an

urban renewal zone in Central Albina, to facilitate the hospital's expansion and modernization.

At the time, Central Albina was about 69 percent Black. Emanuel officially notified the City of

its interest in preparing a development plan for its campus expansion using the urban renewal

program in 1962 and met with the Department of Housing and Urban Development (HUD) to

discuss the possibility of such a plan. The urban renewal of Emanuel was a possibility due to

newly available federal monies under the federal Hill-Burton Program. And the only way to

access that money was for the City to declare the neighborhood "blighted."

    46.    In 1962, the PDC also directed staff to prepare a report regarding the feasibility of

an urban renewal zone in Central Albina, which by then contained 80 percent of Portland's entire

Black population. The Central Albina Study reported, as a foregone conclusion, that the area was

beyond rehabilitation and should be cleared for industrial use: "Clearly, urban renewal, largely

clearance, appears to be the only solution to, not only blight that presently exists in Central

31 – COMPLAINT

Albina, but also to avoid the spread of that blight to other surrounding areas." The study concluded that, "[i]n short, the Central Albina Area bears most of the characteristics of a district in an advanced stage of urban blight."

47.      The 1962 Central Albina Study found that between the area's central location with respect to the City and its points of direct access to the freeway system and the entire major street system of Portland, "the fairly obvious conclusion [is] that at least a large portion of the Central Albina Area would find its most logical future as industrial land." In proposing Central Albina for urban renewal, the study stated that "certainly any plans for the future of the Albina area must consider the needs of Emanuel Hospital[,]" an institution large enough and with plans "of such a magnitude that it can, to some degree, be considered as creating its own environment." While concealed by defendants for decades up to today, the shadows of the conspiracy between Emanuel, the City, and PDC can be clearly seen in these early reports.

### ii.      Defendants acted to conceal their early conspiracy.

48.      While this study was presented to the public as mere "recommendations," what is becoming clear only now is that the study's "findings" were a done deal before it had even been conducted, much less released. The study was a critical step in furtherance of a conspiracy that had developed between Emanuel, the City, and PDC sometime in the late-1950s. In the absence of a preexisting secret agreement between defendants, Emanuel would not have begun to acquire and destroy properties in Central Albina before the study was conducted and long before the City had been authorized to use the tools of urban renewal to complete the destruction of the Albina neighborhood and the displacement of plaintiffs' families. This conspiracy has been concealed for decades by defendants and is only now coming to light.

32 – COMPLAINT

49.     Even on its face, the Central Albina Study provided only a cursory afterthought to the majority-Black residents who would be uprooted by the proposed urban renewal: "[T]he problems of rehousing displaced persons from this area are of considerable magnitude. As noted previously, Central Albina contains a very large population of low-income families and contains a minority racial concentration. Consequently, the problems of finding or constructing sanitary, adequate, low rental housing for displaced persons must be solved along with the redevelopment of land. This factor also suggests the desirability of staging renewal in this area over a period of several years." In other words, City officials and professional planners characterized the challenges of relocating Black families as one of preventing another ghetto but had already concluded that the community was to be displaced regardless of any opposition. That is reflected in the study's caution that public capital expenditures within Central Albina should result in developments in keeping with the long-term and desirable goal of repurposing the area for industrial use; the study discouraged developments such as schools or other facilities "designed to serve a residential community that would, in the foreseeable future, no longer exist." On information and belief, enacting urban renewal in Central Albina was a foregone conclusion, and the likelihood of local residents' opposition was neither a consideration nor concern. The fix was in. Defendants, unbeknownst to plaintiffs' families or the public at large, had engaged a conspiratorial meeting of the minds and had agreed to destroy this Black neighborhood no matter what opposition they might face. This conspiracy has been concealed from plaintiffs by defendants for decades and is only now coming to light.

### iii.    Whiter Upper Albina had a different fate.

50.     Around the same time that the PDC had conducted the Central Albina Study, it had also launched the Albina Neighborhood Improvement Project (ANIP) in Upper Albina.

33 – COMPLAINT

ANIP was the first urban renewal project in Northeast Portland to emphasize neighborhood rehabilitation (public improvements such as street cleanups and park-building, and low-interest loans for home repairs) rather than redevelopment (demolition and land clearance). The program served residences north of Fremont Street and thus excluded the Central Albina area to the south that was being primed for destruction by Emanuel's expansion. By 1967, of the 525 homes in the ANIP area, 165 had received low-interest loans and completed home repairs and improvements. Another 46 homes were in the process of repairs, and 23 more had applied and awaited a decision. Although not criticism-free, Albina residents generally regarded ANIP as a success. Despite more than 1,000 residents' petition for the project to be extended south to Central Albina, the PDC rejected the request to rehabilitate, as opposed to redeveloping, Central Albina. Notably, the ANIP area north of Fremont Street was roughly evenly split between Black and white occupancy, whereas Central Albina to the south was 70 percent Black at the time.

<strong>iv.    Defendants sold the idea of "blight" to further their conspiracy.</strong>

51.    Rather than consider affected residents' interest in substantial rehabilitation of their low-income but vibrant neighborhoods, City agencies and planners treated Central Albina's decline as inevitable and declared it "blighted" beyond salvage and fit only for massive land clearance. As alleged above, defendants had to convince the public that "blight" was the reason for demolition in order to leverage urban renewal dollars. In a 1962 brochure entitled "Meet Creepy Blight," the City promoted that "blight" narrative by using an ogre-like cartoon character depicted as stating: "I destroy houses, neighborhoods, and cities. I'm not really happy unless I'm tearing down a house or two. You've probably seen my work in Portland–those places that look old before their time? Not too long ago they were in good condition. How do I do it? Simple! I make a little neglect go a long ways! You know–all those little things that are going to be fixed

34 – COMPLAINT

'tomorrow.' Well, I get there before 'tomorrow' comes! Don't they see me coming? Some do, but most don't! They don't call me 'Creepy' for nothing, you know!"



*Figure 8: A brochure produced by the Portland Bureau of Buildings that propagandized the idea of "blight" in Central Albina (1962).*

52. In early 1967, the Emanuel Hospital Urban Renewal Plan moved forward after the PDC approved the undertaking of surveys and plans related to the project as well as the filing of the Survey and Planning Grant Application for federal funds with HUD. As justification for its displacement project, the application stated: "There is little doubt that the greatest concentration of Portland's urban blight can be found in the Albina area encompassing the Emanuel Hospital. This area contains the highest concentration of low-income families and experiences the highest incidence rate of crime in the City of Portland. **Approximately 75% to 80% of Portland's Negro population live within the area.** The area contains a high percentage of substandard

housing and a high rate of unemployment. Conditions will not improve without a concerted

effort by urban renewal action. The municipal goals as established by the Community Renewal

Program for the City of Portland further stress the urgent need to arrest the advanced stages of

blight." (Emphasis added.) Also included in the grant application were figures from a 1964

report that Emanuel-hired consultants had produced regarding the future role and development of

the hospital. Known as the Hamilton Report, the document quantified the amount of land needed

for Emanuel's expansion, adding that, "[i]f the hospital is to remain in its present location, of

necessity it must acquire considerably more of the surrounding properties to protect itself from

**undesirable encroachments** in its future." (Emphasis added.) The PDC used the figures in the

Hamilton Report to define the land required for the Emanuel Hospital urban renewal zone: 55.3

acres. Ten days after the PDC's approval of the project, the City council also provided its formal

approval. Although it was concealed by defendants at the time, it is now being revealed that

Emanuel, the City, and the PDC were acting in concert with the concealed preordained goal of

demolishing the Black community in Central Albina, not because of actual urban "blight" but

because they did not want Black people living and thriving in this economically valuable

neighborhood.

        **v.**        **Defendants strove to keep Model Cities out of Central Albina.**

      53.     In 1967, Portland was also in the process of securing federal funding through the

Model Cities Program, an initiative created by the Demonstration Cities and Metropolitan

Development Act of 1966 to provide supplemental planning resources and to improve

implementation of existing urban programs by emphasizing comprehensive planning,

rehabilitation, and citizen participation. Federal regulations governing the Model Cities program

required more extensive public participation in decision-making about all federally funded

36 – COMPLAINT

projects in Model Cities-designated areas, including any urban renewal zones. Notably, "despite

bitter opposition," the PDC had carefully excepted the Emanuel Hospital Urban Renewal Zone

from its Model Cities planning process, shielding the hospital expansion project from the Model

Cities program requirement for widespread citizen involvement in the urban renewal project.

54.     Nevertheless, after Portland received a Model Cities planning grant in November

1967 and formed the program's primary citizen review vehicle—the Citizens' Planning Board

(CPB)—a dispute arose between CPB and PDC as to the CPB's right to review development of

the Emanual Hospital urban renewal project. That caused the City to have to slow down the

project, which was otherwise moving forward without public participation. Eventually, CPB,

PDC, and the board of Emanuel Hospital reached an agreement that the CPB would be kept

informed of and involved in the project as it moved forward, and Emanuel's Survey and Grant

Application to HUD was amended to reflect that working relationship. The involvement of

Model Cities uncovered and emphasized Central Albina residents' desire to rehabilitate their

neighborhood area as a residential community, in contrast to City planners' intent to demolish

and redevelop the area for industrial and institutional purposes.

55.     In its 1971 Report on Urban Renewal in Portland, the City Club described the

relationship between the PDC and Model Cities planning bodies as confrontational. PDC

Chairman Ira Keller had complained in 1969 that, since "the Model Cities concept descended

upon us[,]" "we have not been able to accomplish as much as we were able and anxious to do. It

seems that citizen participation is good in theory but difficult of accomplishment."

56.     The CPB's involvement temporarily slowed but did not meaningfully alter the

predetermined course of the project to displace plaintiffs and other residents of Central Albina.

Between May and July 1970, HUD, CPB, PDC, and the City Planning Commission all approved

37 – COMPLAINT

Emanuel's urban renewal plan. Only after that, in late July 1970, did the City council hold its first public hearing for Central Albina residents and businesses affected by the project. Although the project had been discussed, put into motion, and carried out for over a decade by this time, the public hearing was the first time that many of the residents were officially notified about the hospital's urban renewal and relocation plan. Despite the questionable process and timeline, the City council adopted the plan at that initial public meeting, passing Portland City Ordinance No. 131245, which authorized the PDC to commence the project.

57.     In turn, on August 20, 1970, the PDC, chaired by Ira Keller, adopted Resolution No. 1218, which authorized the PDC to enter into a project financing agreement with Emanuel Lutheran Charity Board (Hospital Board) to provide for financing of the local share of the Emanuel Hospital Urban Renewal Project. Section 1 of the project financing agreement provided that PDC would credit Emanuel for $835,584 toward the hospital's "local share" of the costs of the entire urban renewal project. That $835,584 figure represents Emanuel's costs in purchasing and demolishing about 100 homes in Central Albina between 1963 and 1969. On information and belief, Emanuel would not have committed to a nearly million-dollar undertaking to acquire those properties years before official approval of the urban renewal project, unless there had been a preexisting conspiratorial agreement with the City and PDC for Emanuel to retrospectively be credited for its role in crippling the economically vibrant heart of Portland's Black community. Emanuel knew what the public and plaintiffs' families are only now learning: Not only would the City compensate Emanuel for the costs of displacement and demolition, but the City would finish the job for them. Otherwise, Emanuel would never have expended so much time, effort, and money.

### vi.    EDPA formed to fight for fair relocation and replacement housing.

58.    In response to the City's official approval of Emanuel's expansion project, in September 1970, affected Black residents organized and founded the Emanuel Displaced Persons Association (EDPA) to protest the inadequacy of official notice about, citizen involvement in, and compensation, relocation plans, and affordable housing for those who would be displaced as a result of the project. EDPA also objected to the deception, pressure, threats, fear, and indignity to which Black residents had been subjected by representatives of the City and Emanuel urging them to "voluntarily" relocate from the area. EDPA demanded and secured a public hearing before the City council in October 1970 to express their concerns.

59.    At the October 1970 hearing, EDPA chairperson Ms. Leo Warren testified, "While going door to door for the EDPA, I found many homeowners and tenants filled with tension and frightened as to what the consequence would be because of moving from their homes. This was true of the majority of the older people, especially of women who were alone." Another affected resident, whose first contact with PDC came when an appraiser knocked on his door, expressed, "You are having us move; we don't have any word to say. You've got the thing all mapped out, from somewhere, and you must turn it over to us, and we don't have a word to say." EDPA petitioned City council to affirm the obligation to "see that those displaced can move with dignity without suffering financial loss."

60.    EDPA received no feedback from City council or PDC, despite Mayor Terry Shrunk's initial assurance at the meeting that no relocated citizen would suffer financial loss and that all would be treated fairly. EDPA retained legal representation and submitted a brief to HUD in November 1970, challenging PDC's relocation plan for failing to comply with statutory relocation requirements.

39 – COMPLAINT

61.    EDPA's legal brief to HUD asserted that the relocation plan failed to comply with Model Cities notice and public-hearing requirements before proceeding with land acquisition. At the October 1970 public hearing, the PDC had responded to EDPA's criticism of the City's lack of communications to affected residents by, in part, referring to two informational letters that had been mailed to those in the project area, the second of which had invited them to a public informational meeting on August 21, 1970. As the City Club later found, the first letter was "dated January 28, 1969, a year and a half prior to the meeting, and [the second letter was dated] August 31, 1970, 10 days afterwards. Neither mentioned any public meeting."  Additionally, the City Club found the first letter particularly difficult to understand and opined that it "exhibited a pompous, condescending attitude and did not directly state the nature of the proposed project or its effect on the residents of the project area." EDPA's advocacy focused on procedural due process and relocation rights, because the substantive civil rights violations related to defendants' conspiracy to decimate Central Albina's Black neighborhood because of race was concealed by Emanuel, the City, and PDC, and is only now being discovered.

62.    As a result of EDPA's advocacy, HUD withheld approval of the Emanuel relocation plan until discussions could be held between EDPA, PDC, Emanuel Hospital, CPB, and the City's Demonstration Agency. In March 1971, the parties signed a negotiated settlement, called the Emanuel Replacement Housing Agreement. The agreement provided that there would be cooperation between the parties to develop between 180-300 units of federally assisted low- and moderate-income housing within the urban renewal area as replacements for the demolished units. To date, this agreement to provide one-to-one replacement housing for each demolished unit remains entirely unsatisfied. In recent years, the City and Prosper Portland have developed some affordable housing in Central Albina and have used a novel "preference plan" purportedly

40 – COMPLAINT

designed to allow families displaced from the neighborhood to return. But this plan has done nothing to replace the homeownership lost by plaintiffs and their families.

63.    In September 1971, the Metropolitan Human Rights Commission distributed a number of surveys concerning the Emanuel Hospital Urban Renewal Project and affected residents' satisfaction with the relocation process. A noteworthy number of respondents expressed dissatisfaction, with common reasons being the low amount of money that the PDC was offering (*e.g.*, "they expect for us to give the property away," "price was not right," "not enough money," "they won't meet my price"); the failure of PDC to contact residents about relocation (*e.g.*, "not aware of what is happening"); lack of progress (*e.g.*, "I feel they gave me the runaround," "the progress is very slow"); and the lack of trust in PDC (*e.g.*, "questionable," "PDC doesn't seem truthful,"  "they are bias [*sic*], overbearing, undermining thieves who care nothing about the people but about money [and] land"). In response to the question "What is your overall opinion of PDC's relocation procedures?" about 50 percent of respondents marked "poor."

### vii.    Central Albina is demolished.

64.    One month after the agreement was signed and before fully securing federal funding, defendants began leveling the 22-block target area with bulldozers, permanently displacing hundreds of people. Between 1971 and 1973, PDC demolished an estimated 188 properties—158 of which were residential and 30 of which were commercial. Those properties had been inhabited by approximately 88 families, 83 individuals, 23 businesses, 9 rental businesses, and 4 church or community organizations. Of the 171 reported displaced households,

74 percent were Black, many of whom had owned their homes free and clear.

 

*Figure 9: Demolition of the Hill Block, a building constructed at N. Williams and N. Russell by Albina's first mayor and which served as the center of Albina's business district until its destruction to make way for the Emanuel expansion project. The Hill Block's cupola was relocated to present-day Dawson Park (1973).*

65.     During the decade leading up to the displacement, Emanuel had also privately purchased or otherwise acquired and demolished approximately another 101 properties. Between 1960-1970, Central Albina lost over 3,000 people, or almost half of its majority-Black population. Those residents and businesses forcibly displaced or removed by private action before the official approval of the Emanuel Urban Renewal Relocation Plan received no relocation assistance. The above facts and chronology confirm that Emanuel would never have begun taking these homes from people if they did not have the secret assurance of PDC and the City that the government would finish the job for them via eminent domain. Otherwise, this acquisition would have been for naught. Emanuel needed *all* of the land cleared in order to fulfill the common goal of removing Black people from its immediate proximity and expanding its facilities.

66.     In 1973, federal budget cuts resulted in the expiration of funds for the Hill-Burton hospital construction loan program, and the Emanuel Hospital Urban Renewal Project halted. That same year, a member of the Board of Directors of Emanuel appealed to Oregon Senator Bob Packwood for help, ironically complaining about the financial difficulties of operating a hospital in a "ghetto area" that is "located in a low-income, [B]lack neighborhood," despite Emanuel's role in destroying that neighborhood. By its termination, the project had leveled more than 1,100 housing units, decimated hundreds of businesses, displaced two-thirds of the Central Albina's Black population, and forever altered the heart of Portland's Black community. And, for what? A hospital expansion that never happened.

**F.      Emanuel Purchases the Hill Block, and It Sits Empty.**



*Figure 10: The vacant lot at N. Williams and N. Russell, otherwise known as the "Hill Block," in reference to the historic building that once occupied the site (2022).*

43 – COMPLAINT

67.    In 1980, seven years after announcing its abandonment of the expansion project, Emanuel purchased the vacant lot at located at N. Williams and N. Russell from PDC. The hospital paid $396,777 for the property. As part of the deed agreement, PDC required Emanuel to "begin the redevelopment of the Property by the construction of the improvements thereon within a reasonable period of time and, in any event, the development of the Property for hospital and other related uses shall be completed by January 1, 1990." From the time of its purchase and to date, the property has sat empty as a vacant lot.

**G.    Urban Renewal Begins Again and Continues**

68.    By the end of the 1980s, the Black population of Albina had decreased to 38 percent. Additionally, the home values in Albina were 58 percent of Portland's median value. The Albina Improvement Community Plan was meant to address these issues and more. The plan to gentrify Albina centered on building code enforcement to address abandoned housing and the availability of federal money for housing rehabilitation and the support of nonprofit housing development. These efforts and a booming economy started bringing white homeowners to the area due to the low cost of housing and the ability to renovate.

69.    In 2000, the City once again designated a large portion of North/Northeast Portland an urban renewal area and adopted the Interstate Corridor Urban Renewal Area (ICURA) plan. The City sought to implement the ICURA plan because of "a deteriorating stock of housing and commercial districts, and a number of brownfield challenges." As initially adopted, the ICURA extended from near the Rose Quarter to North Portland Harbor, with Martin Luther King Jr. Boulevard as the eastern border, and covered nine different neighborhoods and 3,700 acres. Since its adoption in 2000, the ICURA plan has been amended 13 times, most recently in 2021. The designated urban renewal area now covers nearly 4,000 acres and, as

44 – COMPLAINT

further discussed below, currently encompasses the vacant Hill Block lot at N. Williams and N. Russell.

70.    To make any modifications to the urban renewal area plan, the designated area must be found to still contain "blight." By categorizing the area as "blighted" yet again, so that it can enact urban renewal there, the City aimed to increase economic value and tax revenues through redevelopment of the land.

71.    The funding mechanism for an urban renewal area is called tax increment financing (TIF). TIF allows the City to freeze the property tax rate in the urban renewal area and redirect those funds to physical improvements. The idea behind TIF and urban renewal is to attract new investors—commercial and residential—to the area, thereby increasing the tax base and raising property values with new businesses and residents. That, in turn, generates greater tax revenue, profiting the City and profiting Prosper Portland.

72.    Even though TIF monies have provided for development of affordable rental housing around Emanuel, affordable rental housing does not generate wealth and savings in the same way that homeownership does. Between the start of the ICURA plan in 2000 and the year 2013, although home values grew, the Black population in the designated area decreased by over 32 percent, the poverty rate increased by 34 percent, and the annual income for Black households decreased by 31 percent.

73.    Furthermore, none of the urban renewal efforts and plan amendments have provided benefits or restitution to the displaced families. Rather, only the City and Prosper Portland benefit from TIF. The continuation and expansion of the ICURA plan serve only to exclude plaintiffs and other displaced families from wealth-growing opportunities.

45 – COMPLAINT

**H.      Defendants Continue to Conceal Their Conspiracy and Further Enrich
         Themselves via The Williams & Russell Project**

74.     In early 2017, after the lot at N. Williams and N. Russell has remained vacant for

over decades, the City informed Emanuel that it would enforce the agreements of the deed and

retake possession of the Hill Block by repaying Emanuel the purchase price. In August 2017,

defendants announced a plan to redevelop the vacant lot. Pursuant to the plan, Emanuel would

contribute the land for community development at no cost. However, in return for the land

transfer, Emanuel would receive significant tax benefits and other financial and reputational

gains. Shortly proceeding announcement of the redevelopment plan was formation of the

Williams & Russell Project Working Group (PWG), the members of which included Black

business owners and nonprofit leaders, the City, Prosper Portland, and Emanuel. The PWG is

tasked with overseeing implementation of the plan for redeveloping at least 1.7 acres of the Hill

Block. The other 2.58 acres remain under Emanuel's ownership. In that role, the PWG has

supported the creation of the nonprofit Williams & Russell CDC—which would own the land

and manage its development—and the selection of a development group to move the project

forward. The PWG had voted in favor of creating the nonprofit despite concerns for lack of

community input and engagement, which also led one of the PWG's co-chairs to resign in

November 2020. Eight members of the PWG were voted onto the board of the new nonprofit,

and Prosper Portland committed to providing support to the new organization.

75.     Plaintiff EDPA2 formed in 2017 in response to the defendants' announcement of

plans to develop the Hill Block. EDPA2 consists of displaced persons and descendants of those

displaced by the threatened Emanuel expansion in the 1970s. EDPA2 initially had one

representative on the PWG, but the seemingly predetermined direction of the group, as well as

personal health issues, led EPDA2's representative to step away from the PWG. Given the size and overall makeup of the group, it was clear that the EDPA2 representative filled merely a token seat.

76.    In 2020, the Hill Block was appraised. The Hill Block is divided into two parcels, each with its own assessed value. The total appraised market value together is over $20 million, with the first parcel assessed at $8,446,000 and the second parcel assessed at $12,274,000. The appraisal is "an estimate of the 'as is' market value" and are "appraised 'as if' zoned CM3, Commercial Mixed Use." The land is currently zoned as CI2-Campus Institutional. The assessment stated that the best and highest use for the land is a multifamily residential development with a commercial component. In March 2020, despite substantial developments around the Hill Block, the property was added to the ICURA. That is, fifty years down the road, the area was once again declared "blighted" so that the City and Prosper Portland could leverage the land for additional TIF funds. In late 2020, Prosper Portland proposed increasing maximum indebtedness—the amount of funds that may be spent on projects, programs, and administration over the life of a TIF plan—for the ICURA by 20 percent, or $67 million, to fund the redevelopment of the Hill Block and other projects in North/Northeast Portland. Of that total proposed amount, $19 million was to be earmarked for the Williams & Russell development project. The money would go directly to the City through Prosper Portland and the Portland Housing Bureau. The City council adopted the amended ICURA plan in early 2021 despite widespread public testimony at the time against adoption of the proposal.

77.    The inclusion of the Hill Block into the ICURA and expansion of maximum indebtedness for development of the Hill Block proceeded against the wishes of those who called Central Albina home. While the City, Prosper Portland, and Emanuel have each

47 – COMPLAINT

apologized for the harm done by urban renewal in Central Albina, they have continued to charge ahead with their plans for once again financially benefiting from land that they had wrongfully taken from plaintiffs' families, leaving out the voices of those most directly affected. Prosper Portland has not engaged with survivors and descendants of the displaced families. Nor have defendants re-engaged with EDPA2 since EDPA2 left the PWG disillusioned by the PWG's function. The City has pointed to various of its actions as signs of listening to the Black community specifically harmed by displacement, such as the North/Northeast "preference plan," development of affordable housing in Central Albina, the adoption of the ICURA plan and its amendments, and the plan to develop the Hill Block using Black-owned developers. In the introduction to a December 2020 hearing on the thirteenth proposed amendment to ICURA plan, Mayor Ted Wheeler even proclaimed that the proposal "shows that the City can learn from the past and can make a positive difference in the lives of people who have been unjustly harmed"— never mind the fact that twenty-four people, many of whom members or supporters of EDPA2, proceeded to offer public testimony against the proposed ICURA plan. In January 2021, against the wishes of those who testified, the City council unanimously voted to approve the amendment.

I.      **No Direct Benefit for the Victims and Emerging Proof of a Conspiracy**

78.     The development of the Hill Block will benefit the City, Prosper Portland, and Emanuel, but not the displaced families, despite the project being falsely trumpeted as an act to repair the harms caused by displacement. The increase in maximum indebtedness generates $32 million, with 70 percent of the funds going to the City's housing bureau and 30 percent of the funds going to Prosper Portland. The City will benefit from an increased tax base and greater tax revenue drawn from the new residents and businesses that will occupy the Hill Block. In turn, new business will attract visitors to the area, which means further economic benefits for the City.

48 – COMPLAINT

Beyond economic benefits, defendants all benefit from the Hill Block reputationally. Prosper Portland, the City, and Emanuel have been celebrating the project as "a great solution to address some long-standing issues" and "righting a historical wrong." Defendants repeatedly point to the Williams & Russell project as repairing harm and furthering racial equity, yet none of them has in any way provided restitution to the direct victims of the Emanuel displacement.

79.    On February 14, 2022, FutureLab, a project of Portland State University's School of Urban Community Development, issued a groundbreaking report about Emanuel's displacement of Black families from Central Albina. For the first time, the FutureLab team was able to document the wide-ranging impacts that racist planning and urban renewal practices have had on Portland's Black community, with a focus on those forced out of Central Albina as a result of the Emanuel Hospital Urban Renewal Project. Using historical property identification files from the project area, archival photographs, stories from EDPA2 members, and other sources, FutureLab developed an interactive StoryMap illustrating the neighborhood that had been demolished for the ill-fated, unconsummated, and pretextual renewal project.

80.    The FutureLab report contains data that, also for the first time, reveals some of the contours of the conspiracy between defendants in this case—a conspiracy concealed for decades by those same defendants. FutureLab staff are demographers with access to modern mapping technologies and data research skills not available until recently. The FutureLab study has begun to reveal the scope of a conspiracy that could not have been uncovered by plaintiffs at an earlier date. Upon information and belief, defendants concealed their conspiracy by taking the false public-facing position that the City was engaged in "blight removal" and that the City and PDC played no role in "Phase One" of the demolition. While the precise details are still being uncovered, it is becoming clear that, during "Phase One" of the demolition of Central Albina,

49 – COMPLAINT

between the late 1950s and 1960s, Emanuel was not acting alone. Upon information and belief,

Emanuel had the sanction and support of the City and PDC (albeit concealed from plaintiffs and

the public) to start pressuring and intimidating plaintiffs and their families out of their homes.

Emanuel would never have expended the time and money necessary to acquire dozens of private

homes if they did not have the secret assurance of the City and PDC that the government would

finish the job for Emanuel using eminent domain. "Phase Two" of the demolition was also phase

two of the previously unknown conspiracy between defendants. During this phase, using

Emanuel-sponsored studies, PDC and the City pushed the false tale of "blight" in Central Albina

in order to unlawfully activate the powers of urban renewal and eminent domain. In fact, any

"blight" that existed had been caused by Emanuel's destruction of approximately 100 homes in

furtherance of this conspiracy. The FutureLab report makes clear that "blight" did not animate

this conspiracy; rather, it was defendants' desire to remove these Black plaintiffs and their

families from this economically desirable neighborhood in N/NE Portland. The generational loss

and trauma that defendants wrought on plaintiffs were not the consequence of any actual blight,

but of pure racism.

81.     Plaintiffs sent the City of Portland and Prosper Portland a tort claim notice

pursuant to ORS 30.275 on September 16, 2022. There has been no substantive response from

defendants to this communication and no effort to reach a settlement.

### III.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 USC § 1985 (Conspiracy to violate civil rights)

82.     Plaintiffs incorporate by reference the above allegations as if fully set forth

herein.

50 – COMPLAINT

83.     Defendants conspired to deprive plaintiffs of their property and due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution.

84.     Defendants acted in furtherance of their conspiracy by using undue influence and intimidation to remove plaintiffs from their family homes based on their race. Defendants denied plaintiffs, as residents of the predominantly Black Central Albina district, an opportunity to rehabilitate their homes from the purported "blight," which—to the extent that any existed—had been created by city housing policies. In contrast, defendants funded and supported rehabilitation opportunities to families in an abutting mixed-race neighborhood, where land seizure would not have benefited Emanuel. Defendants conspired to destroy plaintiffs' Central Albina neighborhood because of the race of its occupants, using "blight" as the false public-facing excuse.

85.     Defendants intended to deprive plaintiffs of equal protection of the law, targeting a majority-Black neighborhood for removal without due process or just compensation.

86.     Plaintiffs suffered injury as a result of defendants' conspiracy, including but not limited to loss of family residences, businesses, community cohesion, educational opportunities, and generational wealth-building.

87.     Defendants actively concealed this conspiracy from plaintiffs and the public for decades and continue to do so to this day. The contours of the conspiracy have only in recent months begun to be uncovered by the FutureLab report and other evidence that can be more fully developed during discovery.

## SECOND CLAIM FOR RELIEF
**Unjust Enrichment**

88.     Plaintiffs incorporate by reference the above allegations as if fully set forth

herein.

89.     As described above, defendants were unjustly enriched at plaintiffs' expenses.

90.     Defendants all received benefits and continue to benefit at plaintiffs' expenses.

Specifically, they are receiving ongoing reputational benefit for publicly declaring that they are

"returning land" to the "Black community" and seeking to develop it with culturally specific

developers and services. Additionally, they have received economic benefits by leveraging the

property for more funding to develop the property and other areas of ICURA plan. Defendants

also receive tax benefits via tax breaks in the case of Emanuel and increased tax revenues in the

case of the City and Prosper Portland. Defendants continue to benefit at plaintiffs' expenses, and

those benefits will continue into the future. The amount of this benefit shall be proven at trial.

91.     Defendants took plaintiffs' property unjustly using intimidation and undue

influence, and under the false pretense of "blight," when race was the real motivation for the

seizure and demolition.

92.     Defendants are aware that they have received these benefits at plaintiffs'

expenses.

93.     As a result of defendants' actions, plaintiffs have unjustly suffered inter-

generational displacement, loss of community, and financial loss in the form of the lost

opportunity to benefit from increased property values, to build inter-generational wealth, and to

maintain housing and social security.

94.      It would be unjust to allow defendants to keep the benefit of their actions without paying financial restitution or returning the taken properties to plaintiffs.

### THIRD CLAIM FOR RELIEF
**Nuisance**

95.      Defendants' actions above substantially and unreasonably interfered with plaintiffs' use and enjoyment of their properties. In so doing, they created a private and public nuisance in the form of abandoned land in Central Albina. The nuisance has been perpetuated and continues into the present day. Plaintiffs have all suffered special injury, different from the public at large, in that their families owned the land taken by defendants and they have suffered the effects of lost inter-generational wealth and displacement that continues to this day by defendants' perpetuation of the nuisance that they created in Central Albina.

96.      The acts of defendants were intentional, and they are culpable for the substantial and unreasonable interference with the land that they had taken from plaintiffs' families.

97.      The public nuisance is ongoing in various ways, including by the fact that, in some instances, the taken remains vacant. Plaintiffs continue to suffer harm as a result of defendants' creation of this public nuisance and defendants' actions that have continued to maintain that nuisance to the present day. The ongoing public nuisance created and maintained by defendants also manifests itself in the loss of inter-generational wealth to plaintiffs and the financial, emotional, and public costs associated with the harms perpetuated by defendants' actions and inactions.

### IV. PRAYER FOR RELIEF

WHEREFORE, plaintiffs now ask the court for the following relief:

98.    To award plaintiffs compensatory damages from defendants, jointly and severally, in amounts to be determined at trial, plus interest from the date of judgment on their conspiracy to violate civil rights claim;

99.    To award plaintiffs costs and attorney fees pursuant to 42 U.S.C. § 1988 and ORS 20.107;

100.    To award plaintiffs compensatory damages and restitution from defendants, jointly and severally, in amounts to be determined at trial, plus interest from the date of the judgment on their unjust enrichment and public nuisance claims;

101.    To declare that defendants have been unjustly enriched by their actions above and that unjust enrichment is continuing and will continue into the future unless enjoined;

102.    To declare that defendants have created a public nuisance that harmed plaintiffs, that this public nuisance is ongoing and continues to harm plaintiffs, and that this public nuisance will continue into the future unless enjoined; and

103.    To grant such other relief as is just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to FRCP 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

DATED this 8th day of December 2022.

Respectfully submitted,

OREGON LAW CENTER
LEGAL AID SERVICES OF OREGON
ALBIES, STARK & GUERRIERO, LLC.


 /s Edward Johnson
EDWARD JOHNSON, OSB #965737

Of Attorneys for Plaintiff

54 – COMPLAINT