# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **EMANUEL DISPLACED PERSONS ASSOCIATION 2,** *et al.*, | Case No. 3:22-cv-1896-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **CITY OF PORTLAND, PROSPER PORTLAND fka PORTLAND DEVELOPMENT COMMISSION, and LEGACY EMANUEL HOSPITAL AND HEALTH CENTER**, | |
| Defendants. | |

Edward Johnson and Stephen Walters, OREGON LAW CENTER, 522 SW Fifth Avenue, Suite 812, Portland, OR 97204; Rebecca Morgan and Diane D. Nguyen, LEGAL AID SERVICES OF OREGON, 520 SW Sixth Avenue, Suite 700, Portland, OR 97204; and J. Ashlee Albies, ALBIES, STARK & GUERRIERO, 1500 SW First Avenue, Suite 1000, Portland, OR 97201. Of Attorneys for Plaintiffs.

Clifford S. Davidson, SNELL & WILMER LLP, 1455 SW Broadway, Suite 1750, Portland, OR 97201; and J. Scott Moede, Chief Deputy City Attorney, and Elizabeth C. Woodard, Deputy City Attorney, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendants City of Portland and Prosper Portland fka Portland Development Commission.

Misha Isaak, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205; and Peter M. Ellis and Rizwan A. Qureshi, REED SMITH LLP, 10 South Wacker Drive, Suite 4000, Chicago, IL 60606. Of Attorneys for Defendant Legacy Emanuel Hospital and Health Center.

**Michael H. Simon, District Judge.**

Plaintiffs allege intentional, race-based destruction of the once-thriving Black

neighborhood of Central Albina (now known as the Eliot neighborhood) in Portland, Oregon.

Plaintiffs state that this destruction took place under the pretense of "blight" removal and

facilitating a hospital expansion that never happened. Plaintiffs are twenty-six individuals

(collectively, the Individual Plaintiffs)[1] and one organization, Emanuel Displaced Persons

Association 2 (EDPA2). The Individual Plaintiffs explain that they are all Black survivors and

descendants of families whose homes were destroyed by Defendants. Plaintiffs add that EDPA2

was recently formed to help the Individual Plaintiffs and others learn about their history and seek

justice and restitution through political advocacy.[2] Plaintiffs name as Defendants the City of

---

[1] The Individual Plaintiffs are Gloria Campbell-Cash, Isaac Campbell, Izeal Campbell, Marilyn K. Hasan, Rosie Taylor, Elizabeth Fouther-Branch, Bobby Fouther, Karen Smith, Alicia Byrd, Brian Morris, Joanne Bowles-Spires, Claude Bowles, Mary Bowles Shoals, Royal Harris, Rahsaan Muhammad, Mike Hepburn, Beverly Hunter, Juanita Biggs, Connie Mack, Travante Franklin, Donna Marshall, Barbara Dumas, Lakeesha Dumas, James Smith Sr., Clifford Tyrone Dumas, and Valda McCauley.

[2] EDPA2 states that it is an ad hoc community organization consisting of survivors and descendants of persons whose homes have been taken and demolished in Central Albina and whose community was fragmented by the never-fully consummated Emanuel Hospital Urban Renewal Project. Plaintiffs allege that EDPA2's purpose and mission are to seek justice and restitution for survivors and descendants of families whose homes were taken by Defendants. Complaint (Compl.) ¶ 4 (ECF 1). In Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss (ECF 27), Plaintiffs explain that EDPA2 was formed to achieve its mission through "political advocacy." ECF 27 at 10, 27 (internal pp. 1, 18). In their Complaint, Plaintiffs allege that EDPA2 had a representative on the Williams & Russell Project Working Group (PWG), a group tasked with planning a proposed development of part of the disputed property, the members of which included Black business owners and nonprofit leaders, the City, Prosper Portland, and Legacy Emanuel Hospital. Compl. ¶¶ 74-75. Plaintiffs state that EDPA2's representative left the PWG in part because it appeared that PWG had a "predetermined direction." *Id.* 75. Plaintiffs add that Defendants have not engaged with EDPA2 after it left PWG. *Id.* ¶ 77. Members of EDPA2 also testified before the Portland City Council in December 2020 in opposition to a development plan in Central Albina. *Id.* Thus, although Plaintiffs do not specifically allege that EDPA2's mission was intended to be accomplished through political advocacy, that is a reasonable inference from the allegations.

Portland (the City); Prosper Portland (Prosper), formerly known as the Portland Development

Commission (PDC); and Legacy Emanuel Hospital and Health Center (Emanuel), a nonprofit

corporation, formerly known as Emanuel Hospital. Emanuel has been in Central Albina

since 1915.

According to Plaintiffs, recently discovered information, allegedly long concealed by

Defendants, brings to light the contours of an alleged conspiracy among Defendants to deprive

the Individual Plaintiffs of their civil rights. Plaintiffs also allege that this racist chapter from

Portland's past continues to cause them harm. Against all three Defendants, Plaintiffs assert a

civil rights claim under 42 U.S.C. § 1985(3)[3] and two state claims under Oregon common law,

for unjust enrichment and public nuisance. Defendants have moved to dismiss the entirety of

Plaintiffs' Complaint, arguing that Plaintiffs lack standing, Plaintiffs' claims are time-barred

under the applicable statutes of limitation, and Plaintiffs fail to state a claim upon which relief

can be granted. In addition, the City and Prosper argue that Plaintiffs' state-law claims against

---

[3] This law provides:

> If two or more persons . . . conspire . . . for the purpose of
> depriving . . . any person or class of persons of the equal protection
> of the laws, . . . the party so injured or deprived may have an action
> for the recovery of damages occasioned by such injury or
> deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Before 1982, this law was codified as 42 U.S.C. § 1985(c). This law

originally was passed in 1871. Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (1871). *See*

*generally* Devin S. Schindler, *The Class-Based Animus Requirement of 42 U.S.C. § 1985(3): A*

*Limiting Strategy Gone Awry?*, 84 MICH. L. REV. 88 (1985).

them are prohibited by discretionary immunity.[4] For the reasons explained below, the Court denies Defendants' motions to dismiss.

## STANDARDS

### A.  Whether a Plaintiff Has Standing

The United States Constitution confers limited authority on federal courts to hear only active cases or controversies brought by persons who demonstrate standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 335-38 (2016); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 89-90 (2013). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 578 U.S. at 338. A plaintiff's standing under Article III of the Constitution is a component of subject matter jurisdiction properly challenged under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010). On a motion to dismiss for lack of subject matter jurisdiction under that rule, it is the burden of the party asserting jurisdiction to establish the existence of subject matter jurisdiction. *Id.* at 1122; *see also Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008).

A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction may be either "facial" or "factual." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.*[5] When a

---

[4] The City and Prosper jointly moved to dismiss (ECF 14), and Emanuel filed its own motion to dismiss (ECF 16). The arguments presented in these two motions largely overlap. Unless otherwise expressly noted, for purposes of the pending motions to dismiss, the Court will treat the arguments of any Defendant as if raised by all Defendants and will simply refer to them as Defendants' arguments.

[5] A jurisdictional challenge is factual when "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Pride v.*

facial challenge is brought at the pleading stage, "general allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (cleaned up); *accord Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."); *Mencinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022) (same).

**B.  Whether a Claim Is Timely**

When a defendant contends that a claim is untimely under an applicable statute of limitations, that is an affirmative defense. Fed. R. Civ. P. 8(c)(1). "Ordinarily, affirmative defenses . . . may not be raised on a motion to dismiss except when the defense raises no disputed issues of fact." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 n.6 (9th Cir. 2018); *see also U.S. Commodity Futures Trading Comm'n v. Monex Credit Co*., 931 F.3d 966, 972 (9th Cir. 2019). In *Monex*, the Ninth Circuit explained that "we can consider an affirmative defense on a motion to dismiss when there is some obvious bar to securing relief on the face of the complaint." *Monex*, 931 F.3d at 973 (quotation marks omitted). "In other words, dismissal based on an affirmative defense is permitted when *the complaint* establishes the defense." *Id.* (emphasis in original).

---

*Correa*, 719 F.3d 1130, 1133 n.6 (9th Cir. 2013) (quoting *Safe Air for Everyone*, 373 F.3d at 1039). When a defendant factually challenges the plaintiff's assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (citation and quotation marks omitted).

**C.  Whether a Pleading Adequately States a Claim**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A court also must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A court need not, however, credit a plaintiff's legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND[6]

Beginning in the late 1950s and continuing into the early 1970s, the City, Prosper, and Emanuel allegedly acted in concert to destroy a predominately Black community and displace hundreds of families from their homes and businesses in the Central Albina neighborhood in Portland, Oregon. The destruction and displacement were done in the name of urban renewal, progress, and the removal of blight. Yet for decades, much of the demolished and cleared land languished empty and unused, creating real blight. This vacant land serves as a constant reminder to the survivors and descendants of those displaced families of what they once had, what their families could have had for generations, and what was taken from them. For the Individual Plaintiffs, the loss of their family homes has meant the deprivation of inheritance and the loss of intergenerational wealth, community, and opportunities.

Plaintiffs contend that recently discovered information, concealed by Defendants, shows that urban renewal and blight were mere pretexts for Defendants' real motive—a desire to remove Black people from the economically valuable neighborhood of Central Albina. According to Plaintiffs, the City, PDC, and Emanuel profited from their actions and, rather than removing blight, created a public nuisance that continues to cause harm. As alleged by Plaintiffs, Defendants conspired to destroy the Central Albina neighborhood and displace Plaintiffs' families and implemented Defendants' conspiracy in two phases. Phase One, which took place from the late 1950s until the late 1960s, involved Emanuel, acting with the secret approval of the City and the PDC, allegedly intimidating many people into selling their homes, which were then destroyed. According to Plaintiffs, Emanuel bought approximately 100 homes in the area around the hospital and then either demolished those homes or intentionally left them vacant.

---

[6] The facts recited are alleged in Plaintiffs' Complaint.

Phase Two, which took place from the late 1960s until 1973, involved the City and PDC allegedly coming "out of the shadows" and publicly engaging in the narrative that Central Albina was "blighted" because of the presence of so many demolished or vacant homes. The City and PDC then took possession of the remaining homes still occupied and the remaining businesses in the community through an allegedly unlawful use of urban renewal and eminent domain. According to Plaintiffs, it was not until early 2021 that they learned that, as part of Defendants' alleged conspiracy to deprive the Individual Plaintiffs of their civil rights, the City had secretly agreed to reimburse Emanuel for the cost of the Phase One purchases and demolitions. Plaintiffs also allege that Emanuel received back, in the form of tax credits granted by the City, every dollar spent in buying and demolishing the approximately 100 homes taken during Phase One.

## DISCUSSION

### A.  Standing

Defendants argue that the Individual Plaintiffs impermissibly assert the rights of third parties (*i.e.*, the original homeowners) and thus lack both constitutional and prudential standing. Defendants also argue that EDPA2 lacks both organizational and associational (or representative) standing. Because Defendants assert only a facial, and not a factual, challenge to Plaintiffs' standing, the Court considers only the sufficiency of Plaintiffs' allegations and makes no factual findings on this issue. *See In re Zappos.com, Inc*., 888 F.3d 1020, 1023 n.2 (9th Cir. 2018).

#### 1.  Individual Plaintiffs

##### a.  Rights of Third Parties

Defendants argue that the Individual Plaintiffs are impermissibly asserting the rights of third parties, specifically the owners of the properties taken or destroyed under the alleged conspiracy. Defendants add that none of the Individual Plaintiffs allege that they owned any of

the affected properties. The Individual Plaintiffs agree that they did not own any of these properties and explain that they are not seeking compensation "as owners" or for injuries inflicted upon anyone other than themselves. The Individual Plaintiffs add that Defendants have mischaracterized the injuries for which the Individual Plaintiffs are seeking relief. Based on this response from the Individual Plaintiffs, the Court will focus on the specific injuries alleged by the Individual Plaintiffs and will consider Defendants' standing arguments in that context.

### b.   Constitutional Standing

To have standing, a plaintiff must have a "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Further, the required personal interest must satisfy three elements throughout the litigation: (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection between the injury-in-fact and the defendant's challenged behavior; and (3) a likelihood that the injury in fact will be redressed by a favorable ruling. *Id.* at 180-81, 189; *see also Spokeo*, 578 U.S. at 338 (reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed by a favorable judicial decision"). The Ninth Circuit, quoting the Supreme Court, has recognized that "injury in fact" is the "[f]irst and foremost of standing's three elements." *In re Sisk*, 962 F.3d 1133, 1142 (9th Cir. 2020) (brackets in original) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)).

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). An injury is "concrete" if it is "'*de facto*'; that is it must actually exist," meaning that it is "'real' and not 'abstract.'" *Id.* at 340. "'Concrete' is not, however, necessarily synonymous with

'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.*

In this lawsuit, the Individual Plaintiffs separately allege that they personally suffered injury caused by the fracturing of their families, the loss of their community and sense of security, and a loss of past and future economic opportunities, including intergenerational wealth. As for loss of community, the Individual Plaintiffs allege that they lost the ability to grow up in a supportive Black neighborhood, where children knew and trusted people, but were displaced into hostile environments, where they were exposed to racism and needed to start over.[7] These are concrete and particularized injuries specific and personal to each of the Individual Plaintiffs.[8]

Further, in the 1921 Tulsa Race Riot, between 100 and 300 people were killed and approximately 1,256 homes, along with churches, schools, businesses, and even a hospital and a library, were destroyed. In 2003, survivors and descendants of persons affected by the Race Riot brought a civil rights lawsuit in federal court, and the district court found that all plaintiffs, including descendants of the direct victims in the Race Riot, had standing. *Alexander v.*

---

[7] *See* Compl. ¶¶ 5-30, 86, 93, and 97. In their motion to dismiss, the City and Prosper distinguish between "Resident" and "Non-Resident" Individual Plaintiffs. In response, Plaintiffs assert that this distinction is both "factually inaccurate and far too narrow." Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss (ECF 27) at 21-22 (internal pp. 12-13). After closely reviewing the Complaint, the Court agrees with Plaintiffs.

[8] As discussed below, Defendants also argue that Plaintiffs lack standing because they assert only an impermissible "generalized grievance." *See, e.g.*, *Lujan*, 504 U.S. at 573-74 (explaining that "a plaintiff raising only a generally available grievance . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large" lacks constitutional standing. But the fact that a harm is widely shared does not necessarily render it a "generalized grievance." *See Sisley v. U.S. Drug Enf't Admin.*, 11 F.4th 1029, 1034 (9th Cir. 2021).

*Oklahoma*, 2004 U.S. Dist. LEXIS 5131, at *21 (N.D. Okla. Mar. 19, 2004). As for the

descendant plaintiffs, the district court expressly found:

> The descendant Plaintiffs in this case do not claim derivative injury
> resulting from a wrong done to a population in general. Rather they
> are alleging specific injury as a result of being the descendant of a
> specific victim of the Race Riot, and they are claiming a direct link
> to the damages caused by the Riot. The Court finds that these
> allegations are sufficient to withstand a motion to dismiss on
> grounds of standing.

Id.[9] Thus, the first element of constitutional standing is satisfied.

The second element of standing requires pleading a causal connection between the

alleged injuries and the Defendants' challenged conduct. Plaintiffs have done so. *See, e.g.*,

Compl. ¶¶ 64-77. The third element of standing requires pleading a likelihood that the alleged

injuries will be redressed by a favorable ruling. As one of their requested remedies, Plaintiffs

seek money damages. There is no dispute that a request for money damages is legally sufficient

to satisfy the third element of standing. *See Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163, 1172

(9th Cir. 2002).

Plaintiffs also seek declaratory and injunctive relief. The City and Prosper argue that

neither form of relief would redress the specific injuries that Plaintiffs allege. A plaintiff "must

show standing with respect to each form of relief sought." *Ellis v. Costco Wholesale Corp.*, 657

F.3d 970, 978 (9th Cir. 2011). To establish standing to seek injunctive relief, a plaintiff must

"allege either 'continuing, present adverse effects'" of a defendant's past illegal conduct, "or 'a

sufficient likelihood that [he] will again be wronged in a similar way.'" *Villa v. Maricopa*

---

[9] The district court, however, also found that the plaintiffs' claims were barred by the
applicable two-year statute of limitations and that no exception or equitable doctrine prevented
dismissal on that ground. *Alexander*, 2004 U.S. Dist. LEXIS, at *34. The Tenth Circuit affirmed,
without discussing standing. *Alexander v. Oklahoma*, 382 F.3d 1206 (10th Cir. 2004).

*County*, 865 F.3d 1224, 1229 (9th Cir. 2017) (first quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); and then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Although Plaintiffs do not allege a likelihood that they will again be wronged in a similar way, they do allege continuing, present adverse effects. Compl. at 2-3 and ¶ 101. That is sufficient.

### c. Prudential Standing

The City and Prosper also argue that Plaintiffs lack "prudential standing" to bring their claims because they assert a "generalized grievance" shared by approximately 250 households. ECF 14 at 21 (internal p. 12). Before the Supreme Court's 2014 decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), law school professors who taught Federal Courts traditionally presented standing as "including two sets of components—constitutional and prudential."[10] As explained by the Supreme Court in 2004, prudential standing, as traditionally understood, had three main strands:

> Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)), *abrogated by Lexmark*, 572 U.S. at 126-27.

The viability of prudential standing as an independent basis for a federal court declining jurisdiction has been, at the very least, called into doubt by *Lexmark*. Indeed, footnote three to that decision reads in relevant part:

---

[10] Ernest A. Young, *Prudential Standing After* Lexmark International, Inc. v. Static Control Components, Inc., 10 DUKE J. CONST. LAW & PUB. POL'Y, 149, 150 (2014).

> The zone-of-interests test is not the only concept that we have previously classified as an aspect of "prudential standing" but for which, upon closer inspection, we have found that label inapt. Take, for example, our reluctance to entertain generalized grievances—*i.e.*, suits "claiming only harm to [the plaintiff's] and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large." While we have at times grounded our reluctance to entertain such suits in the "counsels of prudence" (albeit counsels "close [ly] relat[ed] to the policies reflected in" Article III), we have since held that such suits do not present constitutional "cases" or "controversies." *They are barred for constitutional reasons, not "prudential" ones*.

*Lexmark*, 572 U.S. at 127 n.2 (brackets in original) (emphasis added) (citations omitted). Thus, when a defendant argues that a plaintiff is asserting only a "generalized grievance" (claiming only harm to "every citizen's interest in proper application of the Constitution and laws" and "seeking relief that no more directly and tangibly benefits him than it does the public at large"), constitutional standing under Article III is lacking; it is not an issue of prudential standing. On the other hand, when constitutional standing exists despite an argument that there is only a "generalized grievance," that is the end of the analysis on that issue. Indeed, to conclude otherwise would be to create a tension with "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 126. Thus, nothing more need be said about the City and Prosper's argument about prudential standing based on a "generalized grievance."[11]

---

[11] Regarding the aspect of prudential standing that addresses third-party standing, the Ninth Circuit has stated: "We conclude, in unison with all other courts to have spoken on the issue, that the third-party-standing doctrine continues to remain in the realm of prudential standing." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1118 n.9 (9th Cir. 2015). This does not affect the analysis here. As previously discussed, Plaintiffs are not asserting the rights of third parties, and, as noted, the City and Prosper invoke only the "generalized grievance" prong of prudential standing. ECF 14 at 21 (internal p. 12).

## 2.  Plaintiff EDPA2

Defendants argue that EDPA2, which they sometimes confuse with a legally distinct entity formed much earlier, EDPA1, lacks both organizational and associational standing. Organizations may sue only if they can establish either organizational standing or associational (or representational) standing. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)); *see also Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) ("An association or organization can sue based on injuries to itself or to its members."). Organizational standing turns on whether an organization itself has suffered an injury in fact. *Smith*, 358 F.3d at 1101. Associational (or representational) standing can exist when an organization acts as a representative of members who have been injured in fact and thus could have sued on their own. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976).

An organization has direct standing to sue (*i.e.*, organizational standing) when it suffers a drain on its resources from both a diversion of its resources and frustration of its mission. *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012). Diversion of resources is shown when the organization alters its resource allocation in response to a defendant's challenged actions rather than simply going about business as usual. *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). Frustration of mission is shown when the challenged practices impair the organization's ability to provide the services it was formed to provide. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).

Alternatively, an organization may have associational (or representational) standing, and thus be permitted to maintain a lawsuit on behalf of its members, even if the organization itself has suffered no injury from the challenged action. *Fleck & Assocs., Inc. v. Phoenix, City of, an*

*Ariz. Mun. Corp.*, 471 F.3d 1100, 1105 (9th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-44 (1977)). To have associational standing, an entity must show that: "(1) at least one of its members would have standing to sue in his own right; (2) the interests the suit seeks to vindicate are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 1105-06; *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996); *AlohaCare v. Haw., Dep't of Hum. Servs.*, 572 F.3d 740, 747 (9th Cir. 2009).

EDPA2 has shown both kinds of standing. As for organizational standing, EDPA2 was founded in 2017 in response to Defendants' announcement that they planned to redevelop the vacant lot at the corner of North Russell Street and North Williams Avenue. Compl. ¶ 75. It was also formed to learn about and share the history of Central Albina and to pursue its mission through political advocacy. *See* n.3, *supra*. The alleged concealment by Defendants of their true motives behind the demolition of this neighborhood, and elaborated on below, has allegedly frustrated EDPA2's mission, and that frustration is alleged to be ongoing. EDPA2 also states that it has had to divert time and money to learning about the alleged conspiracy among Defendants. Compl. ¶ 4. EDPA2 also contends that rather than focusing its limited resources on brokering a political solution, it has had to spend substantial time and money chasing down hidden facts. *Id.*

As for associational or representational standing, EDPA2 alleges that as "an ad hoc community organization made up of survivors and descendants of those whose homes were taken and demolished in Central Albina and whose thriving and supportive community was fragmented by the never-fully-consummated Emanuel Hospital Urban Renewal Project," *id.* ¶ 4, it meets the three requirements. As discussed above regarding the Individual Defendants, at least

one of the members of EDPA2 has standing to sue in his or her own right. In addition, the interests this lawsuit seeks to vindicate are germane to the purpose of EDPA2, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit, although their personal participation is not precluded by the presence of EPDA2. The Court denies Defendants' motion to dismiss based on an asserted lack of standing.

## B.  Timeliness

As noted, Plaintiffs allege three causes of action: a violation of their civil rights actionable under 42 U.S.C. § 1985(3); common law unjust enrichment; and common law public nuisance. Claims brought under § 1985 are subject to the same statute of limitations applicable to personal injuries brought under state law. *McDougal v. County. of Imperial*, 942 F.2d 668, 673-74 (9th Cir. 1991); *see also Taylor v. Regents of Univ. of Cal*., 993 F.2d 710, 711-12 (9th Cir. 1993). In Oregon, the statute of limitations for personal injury lawsuits is two years. Or. Rev. Stat. (ORS) § 12.110(1). Similarly, under Oregon law, a two-year statute of limitations applies to unjust enrichment claims grounded in tort. ORS § 12.110(1). Finally, a public nuisance claim under Oregon law does not appear to be subject to any statute of limitations. *See Smejkal v. Empire Lite-Rock, Inc*., 274 Or. 571, 576 (1976) ("One important advantage of the action grounded on the public nuisance is that prescriptive rights, the statute of limitations, and laches do not run against the public right, even when the action is brought by a private person for particular harm." (quoting RESTATEMENT (SECOND) OF TORTS, § 821C, cmt. e)). Finally, a plaintiff who was a minor at the time a cause of action arose may sue within the earlier of five years after injury, or one year after turning 18. ORS § 12.160.

Under federal law, a claim accrues when a plaintiff knows or reasonably should have known of the injury on which the cause of action is based. *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996). In other words, accrual begins "upon awareness of the actual injury . . . and not

when the plaintiff suspects a legal wrong." *Lukovsky v. City & County. of San Francisco*, 535 F.3d 1044, 1049 (9th Cir. 2008); *see also Coppinger-Martin v. Solis*, 627 F.3d 745, 749 (9th Cir. 2010).

Plaintiffs allege that the wrongful conduct that caused their injuries began in the late 1950s and continued until the 1970s. As mentioned, a court may consider an affirmative defense at the pleading stage only when the complaint itself establishes the defense. *Monex*, 931 F.3d at 973. Defendants argue that all three claims accrued no later than the late 1970s (or by the mid-1980s at the latest) because by then the Individual Plaintiffs knew that they had been injured.

Defendants also argue that the accrual of the claims alleged by the Individual Defendants may not be delayed under a theory of continuing wrongs. According to Defendants, Oregon law makes clear that only ongoing tortious conduct, and not merely ongoing harm or effects, can delay accrual. *See Boardmaster Corp. v. Jackson County*., 224 Or. App. 533, 553-54 (2008) (distinguishing between ongoing harm and an ongoing tort); *see also Curzi v. Or. State Lottery*, 286 Or. App. 254, 267 (2017) (noting that a continuing tort can exist "where either no single act gives rise to the tort claim or the plaintiff's harm can be determined only at the end of a series of alleged wrongful acts based on the cumulative effect of the wrongful behavior").

Plaintiffs respond that the running of the applicable statutes of limitation has been tolled by Defendants' conduct of concealment. For all three causes of action, this issue is governed by state law, not federal law. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999) (explaining that although federal claim accrual principles apply to a federal claim under § 1985(3), federal courts "borrow" tolling principles from the forum state). In other words, even for federal claims, state law determines equitable issues of tolling. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 926 (9th Cir. 2004); *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153-54 (9th Cir. 2000).

Under Oregon law, the running of a statute of limitations may be tolled when the party

being sued "fraudulently conceals" the wrongful conduct at issue from the injured party. *MAT,*

*Inc. v. Am. Tower Asset Sub, LLC*, 312 Or. App. 7, 15 (2021). As explained by the Oregon Court

of Appeals:

> "[F]raudulent concealment of a cause of action from the one in
> whom it resides by the one against whom it lies constitutes an
> implied exception to the statute of limitations, postponing the
> commencement of the running of the statute until discovery or
> reasonable opportunity of discovery of the fact by the owner of the
> cause of action. Under this rule, one who wrongfully conceals
> material facts and thereby prevents discovery of his wrong or of
> the fact that a cause of action has accrued against him is not
> permitted to assert the statute of limitations as a bar to an action
> against him, thus taking advantage of his own wrong, until the
> expiration of the full statutory period from the time when the facts
> were discovered or should, with reasonable diligence, have been
> discovered."

*Id*. at 15-16 (brackets in original) (quoting *Chaney v. Fields Chevrolet*, 264 Or. 21, 26-27

(1972)).

According to Plaintiffs, Defendants made false representations about blight and the

lawful implementation of urban renewal, despite being aware of the truth and their own

falsehoods. Plaintiffs add that they did not know the truth and are only now learning it. Plaintiffs

contend that Defendants affirmatively built a false narrative with the specific motive of

concealing from Plaintiffs and others the fact that they had been injured by an illegal conspiracy,

thereby inducing them not to sue Defendants. Plaintiffs also assert that until 2021, this

concealment worked, causing Plaintiffs to refrain from suing because they did not know that

their rights had been violated, only that they had been injured.

Plaintiffs add that Defendants lulled Plaintiffs into believing that they had no cause of

action to assert. Defendants allegedly did this by falsely and affirmatively stating that they were

acting within the letter of the law when declaring Central Albina "blighted," when using urban

renewal laws to destroy the neighborhood and forcibly displace Plaintiffs' families, and when stating that the City and Prosper played no part in Phase One of the demolition. According to Plaintiffs, this concealment involved an intricate public relations effort, including creating the cartoon figure "Creepy Blight." *See* Compl. ¶¶ 51, 80.

Plaintiffs' Complaint alleges that the 2021 FutureLab study "has begun to reveal the scope of a conspiracy that could not have been uncovered by plaintiffs at an earlier date." *Id.* ¶ 80. Plaintiffs add that Defendants had and continue to have sole possession of much of the information about their conspiracy. According to Plaintiffs, the discovery of the facts needed to learn about the alleged conspiracy began with the publication of the FutureLab report in Spring 2021. Plaintiffs describe that report as resulting from an exhaustive and novel demographic analysis using Geographic Information System Mapping. The report states:

> It is therefore not unreasonable to interpret through the city's actions that "blight clearance" served as a fig leaf, and that the forced removal of the Black community from the central city was an underlying policy goal. After all, that is the only aspect in which the Emanuel Hospital project actually succeeded.

ECF 15-1 at 88.

Defendants deny engaging in any concealment, misrepresentation, or lulling. Any conclusion, however, that Defendants did not engage in concealment, misrepresentation, or lulling is not apparent on the face of the Complaint. "Because the applicability of the equitable tolling doctrine often depends on matters outside the pleadings, 'it is not generally amenable to resolution on a Rule 12(b)(6) motion.'" *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993)). That is the situation here. Whether Defendants engaged in concealment, misrepresentation, or lulling will need to await factual development. The Court denies Defendants' motion to dismiss based the applicable statutes of limitation.

### C. Sufficiency of Pleading

#### 1. Section 1985(3)

The four elements of a claim under § 1985(3) are: (1) a conspiracy; (2) undertaken to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and (4) injury to a plaintiff's person, property, or other protected rights. *United Brotherhood of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828-29 (1983).

Emanuel first argues that Plaintiffs have not alleged state action, at least as against Emanuel. The Court rejects this argument for two independent reasons. First, state action is not required for a claim under § 1985(3) based on a racially motivated conspiracy carried out by force, intimidation, or misrepresentation. *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). Second, private conspirators act under color of state law if they willfully participate in joint action with public officials to deprive others of rights protected by federal law. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540 (9th Cir. 1989). Emanuel does not dispute that its alleged coconspirators, the City and Prosper, are local governmental entities sufficient to show state action for these purposes.

Defendants also argue that Plaintiffs have not asserted a claim under 42 U.S.C. § 1983. A claim under § 1985(3), however, does not require as an element that a plaintiff also bring a claim under § 1983. Defendants identify no authority to the contrary, and the two cases they cite do not support their argument.

Defendants further argue that Plaintiffs have not alleged facts sufficient to show that Defendants "reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999). As with all pleading requirements, conclusory allegations of an essential element,

such as the existence of a conspiracy, are insufficient. *See Olsen*, 363 F.3d at 929; *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989)). Plaintiffs, however, do more than just plead conclusions.

According to Plaintiffs, Emanuel incurred $835,584 in expenses toward purchasing and removing homes in Central Albina during a seven-year period before the City or Prosper (then, PDC) entered into a formal financing agreement to reimburse Emanuel for the entire cost of those activities. Compl. ¶ 57. Plaintiffs also allege that because Emanuel ultimately needed to acquire all the privately held real property in the area to accomplish its stated expansion objectives, undertaking such an expense would have been unlikely unless Emanuel had some assurance from the City and Prosper that they would remove any remaining properties from Central Albina. Plaintiffs also allege that the City and Prosper acted to shield Emanuel's expansion project from public scrutiny by excluding the Emanuel Hospital Urban Renewal Zone from a city planning process that required extensive public participation in decision-making about the area's development. *Id*. ¶¶ 53-55. Plaintiffs further allege that the City and Prosper made the claim that Central Albina was blighted to justify and secure funding for the City's *and Emanuel's* removal of Plaintiffs and other Black residents from Central Albina. *Id*. ¶¶ 45-47.

These are more than just conclusory allegations, and they are sufficiently plausible to state a claim of conspiracy. *See Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999) ("[D]irect evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action."). As was the case in *Soo Park v. Thompson*, "[w]hen the entire factual context is

PAGE 21 – OPINION AND ORDER

considered," Plaintiffs have "nudged" their conspiracy claim "across the line from conceivable to plausible." 851 F.3d 910, 928 (9th Cir. 2017).

Emanuel also argues that Plaintiffs have failed to allege facts showing that it acted out of a racial animus, rather than acting only with economic or other legitimate motives. As the Ninth Circuit noted in *Mendocino*, however, "direct evidence of improper motive . . . will only rarely be available." 192 F.3d at 1302. In addition, discriminatory purpose or motivation exists for purposes of § 1985(3) when a defendant selects a particular action at least *in part* because of its adverse effects on a protected class of people. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993). Plaintiffs allege that Defendants themselves cited the high concentration of Black residents in the neighborhood surrounding the hospital as evidence of "urban blight" to garner support for Emanuel's expansion plan. Compl. ¶¶ 51-52. Emanuel also commissioned a report that justified the taking of surrounding properties to protect itself against "undesirable encroachments," which reasonably can be read as racially coded language that refers to Black neighbors. *Id.* ¶ 52. These facts taken together create a plausible inference that the decision to destroy the Central Albina neighborhood was motivated, at least in part, by racial animus. Plaintiffs have sufficiently stated a claim under § 1985(3).

### 2. Unjust Enrichment

The leading Oregon case on unjust enrichment is *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115 (2017). In that case, the Oregon Supreme Court described its approach to restitution and unjust enrichment "as incremental rule development on a case-by-case basis, based on recognized grounds for imposing liability." *Id.* at 127-28. The Oregon Supreme Court also noted this body of law is "notoriously difficult to conceptualize and to summarize." *Id.* at 124. In so stating, the Court rejected the formulation of unjust enrichment that had been used by the Oregon Court of Appeals and which Emanuel cites in its motion to dismiss—"(1) a

benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it" (ECF 16 at 37)—as "lend[ing] a specious precision to an analysis that may be simple or complicated but which at any rate is not susceptible" to such a formulaic checklist. *Id.* at 130 (citations and quotation marks omitted); *see also id.* at 132 ("[W]e conclude that the formula for unjust enrichment in *Jaqua* [*v. Nike, Inc.*, 125 Or. App. 294, 298 (1993)] is inadequate to the task, and we reject it."). Instead, the Oregon Supreme Court in *Larisa's* explained that "Oregon courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." 362 Or. at 133. The Court agrees with Plaintiffs that one of these established legal categories is fraud. *See id.* at 128 (citing the Restatement (Third) of Restitution and Unjust Enrichment for the proposition that fraud is one of the most recognizable sources of unjust enrichment).

Defendants also argue that Plaintiffs fail to plead that *Plaintiffs* conferred any benefit on Defendants. In support, Defendants cite *Atlantic National Trust, LLC v. Gunderson*, 132 F. Supp. 2d 1284, 1289 (D. Or. 2000) (dismissing unjust enrichment claim where the benefit was indirectly conferred on the defendant by a third party and not by the plaintiff). In response, Plaintiffs rely on the Restatement (Third) of Restitution and Unjust Enrichment § 1 on which the Oregon Supreme Court relied in *Larisa's*. That section reads: "A person who is unjustly enriched at the expense of another is subject to liability in restitution." Further, § 1, comment d states, in relevant part: "Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth. Subject to that limitation, the benefit that is the basis of a restitution claim may take any form, direct or indirect." *See also Motameni v. Adams*, 2022 WL

3682940, at *10 (D. Or. Aug. 25, 2022) ("[T]he plaintiff in an unjust enrichment claim can confer a benefit on the defendant through the actions of a third party. The defendant only needs to have received a benefit that rightfully belongs to the plaintiff.").[12] Plaintiffs have sufficiently stated a claim for unjust enrichment.

### 3.  Public Nuisance

Oregon law requires a plaintiff to plead four elements sufficiently to state a claim of public nuisance: (1) substantial interference with a legal interest; (2) unreasonable interference with that legal interest; (3) culpable conduct; and (4) causation. *Hay v. Stevens*, 271 Or. 16, 20-21 (1975); *Jacobson v. Crown Zellerbach Corp*., 273 Or. 15, 19-20 (1975). Further, a claim of public nuisance need not be tied to the use and enjoyment of land. *Raymond v. S. Pac. Co*., 259 Or. 629, 634 (1971). A public nuisance is the invasion of a right common to all members of the public. Because the primary responsibility for preventing public nuisances lies with public authorities, a *private action* to enforce that right requires proof that the plaintiff has suffered or is suffering an injury distinct from the injury suffered by the public at large. *Mark v. State Dep't of Fish & Wildlife*, 158 Or. App. 355, 360 (1999).

Defendants argue that Plaintiffs have not alleged a public nuisance that has caused any Plaintiff injury distinct from any injury suffered by the public. Plaintiffs respond that for decades, much of the demolished neighborhood and cleared land in what was once Central

---

[12] Emanuel also argues that because it is a tax-exempt entity under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), it could not have been unjustly enriched by the tax benefits that Plaintiffs allege. *See* Compl. ¶ 90 (alleging tax benefits received). In response, Plaintiffs cite *Emanuel Lutheran Charity Board v. Department of Revenue*, 263 Or. 287, 290-91 (1972), for the proposition that vacant land that is merely being held for future use by a tax-exempt entity would not be deemed "actually occupied or used" for charitable work within meaning of the state law establishing an exemption from property tax for a charitable institutions' property that is exclusively occupied or used in charitable work carried on by that institution. A more thorough analysis of this issue may await another day.

Albina has languished empty, creating actual blight. That vacant land also serves as a reminder to the Individual Plaintiffs—the survivors of the displaced families—of what they once had, what their families could have had, and what was taken from them. Thus, Defendants' conduct allegedly has substantially and unreasonably interfered with the legal interests held by Plaintiffs not to be deprived of these benefits based on their race. Compl. ¶ 95. Further, the land where the Individual Plaintiffs and their families lived now sits abandoned, vacant, or occupied only by parking lots, parking structures, or "brownfields."[13] Compl. ¶¶ 11, 16, 21-22, 26.

The Court finds that Plaintiffs allege both a harm to the public and a distinct harm to themselves. The decimation of Central Albina and the failure to expand the hospital as promised, leaving vacant and abandoned land has certainly injured the public generally. Not only does Portland no longer have a thriving Black community in Central Albina, it also does not have an *expanded* healthcare center as promised in the name of "urban renewal" and "progress." Instead, there sits vacant and abandoned land with "brownfield challenges." This has "injuriously affected the morals of the public" and has worked "substantial annoyance, inconvenience and injury" to the public. *See Bowden v. Davis*, 205 Or. 421, 444 (1955). But in addition, the specific injuries to the Individual Plaintiffs based on having their family homes, intergenerational wealth, and childhood communities taken from them have also caused them distinct and unique injuries.[14] Plaintiffs have sufficiently stated a claim for public nuisance.

---

[13] "A brownfield is a property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant." Overview of EPA's Brownfields Program, U.S. Env't Prot. Agency, https://www.epa.gov/brownfields/overview-epas-brownfields-program (last visited November 30, 2023).

[14] *See* Linda S. Mullenix, Public Nuisance: The New Mass Tort Frontier 6 (2024) ("It has always been the nature of common law to adapt to changed circumstances. We may

**D.  Discretionary Immunity**

The City and Prosper argue that Plaintiffs' state-law claims against these municipal

Defendants are barred by the discretionary immunity provided under ORS § 30.265(6)(c). That

law states: "Every public body . . . [is] immune from liability for . . . [a]ny claim based upon the

performance of or the failure to exercise or perform a discretionary function or duty, whether or

not the discretion is abused." *Id*. Further, the City and Prosper add that discretionary immunity

applies even to intentional conduct. *See Donahue v. Bowers*, 19 Or. App. 50, 58 (1974) ("A

public officer or employee who is performing a discretionary function and is acting within the

scope of his authority is immune from personal liability for his act, notwithstanding that such act

was done, as alleged here, willfully and without justification or cause and with intent to injure

and distress the plaintiff."); *accord Westfall v. State ex rel. Or. Dep't of Corr.*, 266 Or. App. 14,

21-22 (2014) ("We reaffirm what we have held in the past: Discretionary immunity can apply to

claims for intentional torts.").

In response, Plaintiffs rely on a decision from the Oregon Court of Appeals noting that

"[d]iscretionary immunity under ORS § 30.265(6)(c) is an affirmative defense" and "it is the

governmental defendant's burden to establish it." *See Nathan v. Dep't of Hum. Servs.*, 288 Or.

App. 554, 582 (2017) (quoting *John v. City of Gresham*, 214 Or. App. 305, 311 (2007)); *see also*

*Sande v. City of Portland*, 185 Or. App. 262 (2002) (stating that a discretionary immunity

defense requires evidence of the actual consideration process by which a decision was reached);

*Stevenson v. State Dep't of Transp.*, 290 Or. 3, 15 (1980) ("The burden is on the state to establish

its immunity. In some instances, the nature of the function alone is sufficient to establish

_____

anticipate that common public nuisance law will continue to develop to embrace more flexible
standards of public rights, harm, and remediation.").

immunity. In other instances, evidence of how the decision was made is necessary."). Plaintiffs argue that, at this stage of the litigation, neither the City nor Prosper has produced any evidence of a deliberative process that would support the affirmative defense of discretionary immunity. The Court agrees. Thus, at this stage of the litigation, the City and Prosper's argument based on discretionary immunity against Plaintiffs' state claims is premature.

## CONCLUSION

The Court DENIES both the Joint Motion to Dismiss of Defendants City of Portland and Prosper Portland (ECF 14) and Defendant Legacy Emanuel Hospital and Health Center's Motion to Dismiss (ECF 16).

**IT IS SO ORDERED**.

DATED this 1st day of December, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge